UNITED STATES of America,
Plaintiff–Appellee,

v.

Chavel STERLING,
Defendant–Appellant.

No. 89–3428.

United States Court of Appeals,
Seventh Circuit.

Argued May 17, 1990.
Decided Aug. 10, 1990.

Colleen D. Coughlin, Barry R. Elden, Asst. U.S. Atty., Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Steven B. Muslin, Chicago, Ill., for defendant-appellant.

Before CUMMINGS and KANNE, Circuit Judges, and SNEED, Senior Circuit Judge.*

* Hon. Joseph T. Sneed, of the Ninth Circuit, sit-

SNEED, Senior Circuit Judge.

Chavel Sterling appeals her conviction for possession with intent to distribute 1,927 grams of a mixture containing cocaine. She argues that the district court erred by permitting evidence obtained by arresting officers from an illegal *Terry* stop, an unreasonable seizure of her luggage, and a non-consensual search of her purse and wallet. The district court rejected these contentions. We affirm.

## I.

## FACTS AND PROCEEDINGS BELOW

A. *The Encounter at the Airport.*

On February 28, 1989, Richard Crowley, a Chicago policeman who had been assigned to the Drug Enforcement Administration (DEA) for five years, and Agent Douglas Hopkins, who had been with the DEA for six months, were monitoring flights from drug-source cities at Chicago Midway Airport as part of a general surveillance effort directed at apprehending drug couriers. The officers observed Chavel Sterling, one of the last persons to deplane from an incoming flight from Miami, as she entered the gate area and proceeded toward the terminal. The flight had arrived between 11:00 a.m. and 11:10 a.m. Although they had received no prior information indicating any wrongdoing on Sterling's part, the officers witnessed appellant looking over her shoulder several times as she proceeded through the concourse.

The agents decided to follow her discretely. They saw her stop at the women's washroom and hesitate there without entering it. Again she looked around. She then continued toward an airport security area where boarding passengers submit to a check. The agents witnessed appellant pause there, then look around before proceeding. When Sterling arrived at the baggage area, the agents observed her glance around again before walking to a window, where she looked out toward the sidewalk before sitting down.

ting by designation.

After she had picked up her suitcase from the conveyor belt and returned to her seat, Officer Crowley and Agent Hopkins approached Sterling at approximately 11:40 a.m. They were dressed in plain clothes, their firearms hidden. According to their testimony, after identifying themselves and displaying their credentials, Agent Hopkins said to Sterling that they were "looking for someone out here, and I would like to ask you some questions, if I may." The officers testified that Agent Hopkins told Sterling that she was not under arrest, that she did not have to speak to the officers if she did not want to, and that she was free to leave. They also stated that they were standing to her side and not blocking her way.

Sterling gave her name to the agents and told them she had no identification on her person. When they asked her why she had been in Miami, she replied that she had gone to visit her cousin, Timmy Bernard. She did not, however, have his Miami address or telephone number. She explained that when she arrived in Miami, Bernard's sister, Kathy, met her at the airport and told her that Bernard was then driving to Chicago to see her. The agents testified that Sterling seemed uncertain whether Bernard's sister was also her cousin and that she was unsure of the name of the hotel in Miami, at which she claimed to have stayed for several days. The officers stated under oath that she consented to their request to examine her airplane ticket receipt, which she represented having bought at a travel agency. They believed this statement to be a lie: the ticket receipt was stamped as purchased for cash that morning at the Midway Airlines counter in Miami.

The agents then began to inquire about Sterling's suitcase. She acknowledged that it was hers and initially said that she had packed it herself. But upon being asked whether it contained narcotics, she said that a friend had packed it for her. She

refused to reveal the name of the friend. The agents testified that Sterling then consented to a search of her suitcase, but she asked the officers to wait until after she had telephoned her friends and they were present. The agents also told her again that she was free to leave.

After this initial conversation, which lasted between five and ten minutes, the officers backed off a distance of thirty feet. Sterling then made a telephone call. Her suitcase appears to have remained near the agents at their request. The agents approached her again to ask whether she had made contact with her friends. They then moved approximately thirty feet away and continued to watch her. At approximately 12:30 p.m., an unidentified woman arrived who, after a brief conversation with Sterling, quickly left the airport. Sterling retook her seat by the window. Officer Crowley followed the unidentified woman out of the terminal and saw her being driven away. The agents then returned to Sterling and asked about the unidentified woman. Sterling told them that the woman had come to pick her up, but that she did not know why the woman left the airport.

The agents then repeated their request that she permit them to search her suitcase. When she refused, they told her that they had reasonable suspicion that the suitcase contained narcotics and, as a result, were entitled to detain the luggage for the purpose of permitting a narcotics detection dog to sniff it for drugs.[1] They explained that should the dog react as though drugs were inside the suitcase, they would then get a warrant to search it. They also informed her that if the suitcase contained narcotics, they would seek a warrant for her arrest. If they found no drugs, they would have her suitcase returned to her.

According to the officers' testimony, the agents received Sterling's consent to search her purse.[2] Inside, the officers

---

1. The transcript of the suppression hearing does not reveal whether the officers announced their detention of Sterling's suitcase prior to, or after, they arranged for a patdown search.

2. Sterling contends that she did not consent to the search of her purse. The district court, however, found that appellant's testimony on this point was not credible, and that although

found the one-way airplane ticket receipt from Miami to Chicago,[3] a receipt for one night's stay at a Holiday Inn in Miami, and Sterling's wallet, which contained her driver's license. The officers then summoned a female agent who conducted a patdown search. They found no narcotics in her purse or on her person. They then gave her a receipt for the suitcase and made arrangements for the return of her luggage in the event the dog did not react upon sniffing it. At about 1:15 p.m., Sterling left the terminal, approximately two hours after she deplaned.

The agents then paged Detective Thomas Kinsella, a handler of narcotics-trained dogs, who arrived at Midway Airport at about 2:30 p.m. with "Rex," the narcotics dog. Agent Hopkins and Officer Crowley had placed Sterling's suitcase in the DEA office at Midway. "Rex" reacted positively to the suitcase and the officers thereupon obtained a search warrant. Inside the suitcase the officers found approximately two kilograms of a mixture containing cocaine.

### B. The Proceedings Below.

On March 23, 1989, a grand jury indicted Sterling for possession with intent to distribute cocaine. At an evidentiary hearing on June 13, 1989, Sterling moved to suppress all the evidence obtained by the officers. The motion was denied. On July 11, 1989, Sterling entered a guilty plea to the indictment, but reserved her right to appeal the district court's denial of her motion to suppress. Sterling was sentenced to a prison term of five years and a term of five years of supervised release. She filed a notice of appeal on November 2, 1989. Our jurisdiction over the appeal derives from 28 U.S.C. § 1291 (1988).

### II.

### DISCUSSION

Before us Sterling repeats the three contentions advanced at the suppression hear-

ing. First, she argues that the initial questioning by the agents was tantamount to a prohibited "stop" within the meaning of *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968), because a reasonable person would have believed that she was not free to leave. *See, e.g., Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). Moreover, she maintains that the agents lacked the reasonable suspicion for detaining her sufficient to constitute a proper *Terry* stop. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 880, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975).

Second, Sterling contends that the seizure of the luggage was also unsupported by reasonable suspicion. *See United States v. Place*, 462 U.S. 696, 708–10, 103 S.Ct. 2637, 2645–46, 77 L.Ed.2d 110 (1983) (applying *Terry* analysis to detention of luggage and holding that 90–minute period for holding luggage was unreasonable). Finally, appellant argues that the search of her purse and wallet also violated the Fourth Amendment because her consent was obtained only by a show of apparent police authority. *Schneckloth v. Bustamonte*, 412 U.S. 218, 233, 93 S.Ct. 2041, 2050, 36 L.Ed.2d 854 (1973). We shall address these arguments in turn, but none is persuasive.

### A. Was the Agents' Encounter With Appellant in the Airport a Stop?

#### 1. The Initial Encounter.

The first question is whether the initial questioning of Sterling constituted a stop that under *Terry* would require reasonable suspicion, *United States v. Borys*, 766 F.2d 304, 309 (7th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986), or, alternatively, whether it was the type of consensual encounter that does not implicate the Fourth Amendment. *See United States v. Boden*, 854 F.2d 983, 991

the agents' testimony had been contradicted, it had not been impeached.

**3.** The transcript of the suppression hearing does not make clear whether the agents gave the airplane ticket receipt back to Sterling after they

examined it during the initial encounter. That assumption is reasonable despite the implication in Officer Crowley's testimony that he kept the ticket carbon.

# 1082

(7th Cir.1988). The district court found that the questioning of Sterling was consensual, a finding we review for clear error. *United States v. Talkington,* 843 F.2d 1041, 1045 (7th Cir.1988); *United States v. Santucci,* 674 F.2d 624, 631 (7th Cir.1982), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 737, 74 L.Ed.2d 959 (1983). This standard of review is based on the recognition that the district judge had the opportunity to observe the demeanor as well as to hear the testimony of the witnesses. *United States v. $73,277, United States Currency,* 710 F.2d 283, 288 (7th Cir.1983).

■ To determine whether an encounter was consensual, several factors should be examined, including whether defendant believed she was free to leave, *Boden,* 854 F.2d at 991, the types of questions asked by the agents, *United States v. Black,* 675 F.2d 129, 134 (7th Cir.1982), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983), the duration of the questioning, *Borys,* 766 F.2d at 310–11, and the setting of the encounter, *United States v. Jaramillo,* 891 F.2d 620, 625 (7th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1791, 108 L.Ed.2d 792 (1990).

■ Although this court has "repeatedly suggested that a district court make a specific finding as to freedom to leave in the Fourth Amendment context," *Boden,* 854 F.2d at 991, the district court did not do so in this case. Nevertheless, on the facts of this case, a reasonable person would have believed that she was free to leave. The agents' approach to Sterling, their identification, and their inquiry whether she would be willing to answer several questions do not constitute an investigative detention. *See, e.g., Black,* 675 F.2d at 133; *see also Borys,* 766 F.2d at 310. Twice Sterling was told she was free to leave. First Agent Hopkins, after identifying himself, told Sterling that she did not have to speak with the officers and was free to leave. Second, a few minutes later, when the agents began to inquire about appellant's suitcase, they told her that she

did not have to consent to a search, that she was not under arrest, and that she was free to leave if she wished. The agents then moved approximately thirty feet away until after the arrival and hasty departure of the unidentified woman who ostensibly was to give appellant a ride. At that point, she was not under arrest and was free to leave.[4] On these facts, therefore, a reasonable person would have felt free to depart.

We recognize that many persons, after being questioned briefly by officers, might be hesitant to leave even when told by the officers they are free to do so. Departure, they fear, might invite suspicion on the part of the officers. While this is an understandable reluctance, a holding that would render such an encounter nonconsensual would be without legal foundation. Having invited one to depart from their presence, officers cannot use such departure as the single additional event that ripens their preexisting concerns to the "founded suspicion" that a *Terry* stop requires. Were the law otherwise, the officers' invitation to depart would present the subject of interrogation with a Hobbesian choice. To stay could lead to inculpation; to depart surely would. Sterling confronted no such awkward choice. She was free to leave during this initial encounter.

Other circumstances attending this encounter with the officers also suggest that no forbidden "stop" had occurred, as demonstrated by the type of questions asked. During the initial phase of the encounter, the agents asked Sterling for identification and whether they could look at her airplane ticket receipt. "[T]he mere request for and voluntary production of [driver's licenses and airplane tickets] does not constitute a seizure, but rather falls into the category of a non-coercive police-citizen encounter." *Black,* 675 F.2d at 136. In this case the officers asked her if they could keep the ticket. According to their testimony, she consented and said she was "just going to throw it away anyway."

---

**4.** We discuss *infra* when this encounter lost its consensual character and took on the trappings

of an investigative detention.

Nor was the length of time of the stop sufficient to expand the encounter into a seizure. The initial phase in which they asked Sterling questions lasted between five and ten minutes. The second encounter—after Sterling made a telephone call—lasted only a few minutes. The agents then waited approximately forty-five minutes some thirty feet away before they approached her again after the departure of the unidentified woman. "Continual interrogation for forty-five minutes would present a completely different picture from the sporadic questioning spanning three-quarters of an hour at issue here." *Borys,* 766 F.2d at 311.

Finally, the physical surroundings of the encounter do not qualify it as a seizure. A reasonable person is less likely to feel the coercive pressure of law enforcement officers when the encounter takes place in a public place. Foyers of airport terminals are non-coercive, public places. The baggage area at Midway was such a place. *See $73,277 United States Currency,* 710 F.2d at 289 (noting that "all of the events transpired in an open, public area of the concourse with many other travelers present").

We conclude, therefore, that the initial questioning of Sterling by the agents did not constitute an unreasonable *Terry* stop. Under these circumstances, it is irrelevant whether the agents had a reasonable suspicion that "criminal activity may be afoot" when they first approached her. *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884.

2. The Ripening of the Consensual Encounter into a Permissible *Terry* Stop.

 The standard employed in determining whether that initial, consensual interview ripened into an investigative detention is an objective one. " '[A] person has been "seized" within the meaning of the Fourth Amendment ... only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)).

Obviously a consensual encounter can become an investigatory detention as a result of police conduct. *See, e.g., United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983) (holding that a seizure occurred when defendant refused to consent to search of his luggage and agents said they were going to take it to a judge to get a search warrant); *United States v. Jaramillo,* 891 F.2d 620, 624 (7th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1791, 108 L.Ed.2d 792 (1990) (consensual encounter ripened into a stop when patdown search was initiated); *United States v. Palen,* 793 F.2d 853, 857 (7th Cir.1986) (statement by agent that defendant was suspected of carrying narcotics ripened the questioning into a stop).

In this case, the consensual questioning of Sterling by the officers ripened into an investigative detention shortly after the unidentified woman left the airport and the agents approached appellant for the third time. Thereafter three crucial events took place: (1) the agents repeated their request to search Sterling's suitcase, which she for the first time refused; (2) they informed her of their intention to detain the suitcase pending the arrival of a narcotics detection dog; and (3) they summoned a female officer to conduct a patdown search.

The issue now becomes whether the agents had reasonable suspicion of criminal activity by this time. We hold that they did. Although the fact that Sterling met the drug courier profile alone does not support a finding of reasonable suspicion, *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam), the agents gained enough information during the course of the consensual questioning to justify a finding of reasonable suspicion.

Our determination must be based on the "totality of the circumstances." *See United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citation omitted). Included in that "totality" are the officers' experience and knowledge, the

characteristics of persons engaged in illegal activities, and the behavior of the suspect. *$73,277 United States Currency*, 710 F.2d at 290. As the Court observed in *Sokolow*, "the DEA has trained narcotics officers to identify drug smugglers on the basis of the sort of circumstantial evidence" seen in the airport stop, drug courier profile situation. 109 S.Ct. at 1587 n. 6.

The agents identified Sterling initially because she arrived from a drug source city, deplaned among the last passengers, and looked around repeatedly. Once the officers had asked Sterling a few questions, they gleaned more facts that led them to suspect criminal activity. First, they learned that Sterling purported to have no identification on her person and that she had gone to Miami to see her cousin, Timmy Bernard, without knowing his address or telephone number. She then told them that after she arrived in Miami, she learned that Mr. Bernard was driving to Chicago to visit her. Moreover, the officers learned that Sterling met her cousin's sister in Miami, but was uncertain at first whether Bernard's sister was also her own cousin. Finally, the agents learned that Sterling could not tell them the name of her hotel in Miami.

The officers were entitled to interpret these answers in light of their experience. *Brignoni–Ponce*, 422 U.S. at 885, 95 S.Ct. at 2582; *see also $73,277, United States Currency*, 710 F.2d at 290. Here Sterling had an improbable story; the officers appropriately assessed, and the district court properly found, that her answers were an effort to conceal the truth.

When she voluntarily produced her airplane ticket receipt, the officers were not only able to verify an outright lie,[5] they were also able to establish that Sterling had conformed to a "standard operating procedure for drug smugglers." *Jaramillo*, 891 F.2d at 627 (that is, purchase of airplane ticket with cash); *see also United States v. Espinoza–Alvarez*, 839 F.2d 1201, 1206 (7th Cir.1987) (same). We thus con-

clude that the consensual encounter ripened into an investigative stop when the agents told Sterling they intended to detain her suitcases and patted her down. Moreover, we find that the agents had a reasonable suspicion for this detention.

### B. *Was the Detention of Sterling's Suitcase Reasonable?*

Once the agents "stopped" Sterling, "the principles of *Terry* and its progeny would permit the officer[s] to detain the luggage briefly to investigate the circumstances that aroused [their] suspicion, provided that the investigative detention is properly limited in scope." *United States v. Place*, 462 U.S. 696, 706, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983); *see also United States v. Edwards*, 898 F.2d 1273, 1277 (7th Cir. 1990). Sterling challenges the reasonableness both of the agents' decision to detain her suitcase and of the duration of the detention.

#### 1. The Reasonableness of the Detention Itself.

The factors that led the agents to "stop" Sterling after the departure of the unidentified woman also justified their detention of her suitcase. The initial questioning revealed information that focused suspicion on the suitcase itself. The agents asked Sterling whether the suitcase belonged to her. She responded by acknowledging it was hers and that she knew its contents because she had packed it herself. Upon being asked by the agents whether the suitcase contained narcotics, she reversed herself and said that a friend had packed the suitcase. However, she would not give the name of the friend.

Despite being told that she was free to leave, Sterling consented to a search of her luggage, provided it was done after the arrival of her friends whom she wanted to be with her when the agents opened the suitcase. The agents then left her alone. Sterling moved about freely. She used the telephone and waited by herself for her

---

5. She had told them that she had bought the ticket at a travel agency. The ticket receipt, however, was stamped as paid in cash at the Midway Airways counter in Miami on the same day of the flight.

friend to arrive without interference from the officers. When the woman appeared at the airport, Sterling spoke to her out of the agents' earshot, before the friend hurriedly left the terminal. Officer Crowley followed the woman out of the airport and observed her entering an automobile, which then drove away. At this point, the officers had more than ample facts upon which to base their suspicions of Sterling's criminality and to justify the detention of her suitcase.

2. The Reasonableness of the Duration of Detention.

 Even if the decision to detain a suitcase is made on the basis of reasonable suspicion, the duration of the detention may abridge constitutional standards. In *Place*, the Supreme Court held that "[t]he length of the detention of respondent's luggage alone [i.e., ninety minutes] precludes the conclusion that the seizure was reasonable in the absence of probable cause." 462 U.S. at 709, 103 S.Ct. at 2645. The Court determined that the agents were not diligent in pursuing their investigation. Even though the agents were aware of the defendant's flight touching down and that the defendant was suspected of carrying narcotics, *id.*, the Court condemned "the failure of the agents to accurately inform [the defendant] of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage" in the event the dog did not positively identify narcotics. *Id.* at 710, 103 S.Ct. at 2646.

The government argues that the present case is much closer factually to *United States v. Borys*, 766 F.2d 304 (7th Cir. 1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986). As the *Borys* court noted, a narcotics dog may not always be immediately available to DEA agents at the airport, even when the agents have acted with great diligence. *Id.* at 313–14.[6]

In the instant case we have no difficulty in concluding that the officers acted with reasonable diligence in pursuing the investigation of Sterling. Appellant directs us to no facts that suggest dilatoriness on the agents' part. Moreover, we decline to hold that the agents' failure to telephone the narcotics canine detection unit prior to the actual seizure was lacking in diligence. Both agents were needed in the area with Sterling, one to watch her and the other to monitor any persons who might have been acting in concert with her. In addition, it is never clear until near the end of the operation at which point a seizure can be made properly. Once Detective Kinsella was reached by pager, the officers acted diligently to complete the investigation without undue delay.

C. *Did Sterling Consent to the Search of Her Purse?*

 Finally, we turn to the purse search issue. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). The factual findings of a district court regarding a person's consent to be searched must be upheld unless those findings are clearly erroneous. *Borys*, 766 F.2d at 314. The district court found that the testimony of the two officers that Sterling consented had not been impeached and that her testimony was not credible. Such findings are dependent on the credibility of witnesses. *Cf. United States v. Teslim*, 869 F.2d 316, 321 (7th Cir.1989); *Black*, 675 F.2d at 134.

According to the agents, Sterling permitted the officers to search her purse, and voluntarily handed it to Agent Hopkins. The agents' action did not constitute a coercive demonstration of authority that a reasonable person could not have ignored. *See United States v. Notorianni*, 729 F.2d

---

**6.** For example, even if the dog were at the airport, several flights might arrive at once, and it is not possible for agents to predict exactly where and when they will need the services of a dog. *See Borys*, 766 F.2d at 314.

520, 522 (7th Cir.1984) (describing whether a reasonable person would have felt unable to "thumb his nose at the agent"). In view of the repeated statements by the agents that appellant was not under arrest and that she was free to leave, the record contains no support for appellant's contention that she did not consent to the search of her purse.

In this respect, the case is indistinguishable from *Borys*, which upheld a district court finding that the defendant consented to a search of his briefcase. 766 F.2d at 314. The court found " 'highly relevant' " that the agents twice informed the defendant of his right to refuse, and that with respect to his other luggage, the defendant exercised that right. *Id.* (citation omitted). Agent Hopkins and Officer Crowley informed Sterling of her right to refuse a search, and she too, like the defendant in *Borys*, exercised that right with respect to her suitcase. We find, therefore, that the district court properly determined that the search of the purse was made with Sterling's consent.

For the foregoing reasons, the decision of the district court denying appellant's motion to suppress is affirmed.

AFFIRMED.