UNITED STATES of America, Plaintiff,

v.

**David Harrison YEARWOOD, Defendant.**

**No. 92 CR 339.**

United States District Court, N.D. Illinois, E.D.

Oct. 16, 1992.

---

Daniel George Martin, Federal Defender Program, Frederick F. Cohn, Chicago, Ill., for defendant.

Alan Neil Grossman, U.S. Attorney's Office, Chicago, Ill., for plaintiff.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

On May 1, 1992, Drug Enforcement Agency ("DEA") agents found cocaine in a canvas bag carried by Defendant David Harrison Yearwood ("Yearwood"). Yearwood moved to have physical evidence and statements suppressed, claiming Fourth Amendment violations. Magistrate Judge W. Thomas Rosemond conducted a hearing and, based on testimony, exhibits, and oral argument by the attorneys, denied the de-

fendant's motion. Yearwood now objects to Magistrate Judge Rosemond's decision.[1]

## I. FACTUAL BACKGROUND

On May 1, 1992, Yearwood went to the Los Angeles airport and used cash to purchase a one-way ticket to Chicago on American Airlines flight # 84. Robert Connors ("Connors"), an O'Hare security officer, called Robert Scheuler ("Scheuler"), a DEA agent in Chicago, and told him that a man calling himself David Harrison had paid for a one-way ticket to Chicago with cash shortly before the flight was scheduled to depart, appeared somewhat nervous, was carrying a new-looking black canvas bag, and had refused to allow a DEA agent to search the bag. Connors described the passenger as a tall, thin black man in his early twenties with closely-cropped hair. Scheuler then passed this information along to Officer Carlos Mostek ("Mostek"), a Chicago Police officer detailed to the DEA Transportation Group at O'Hare. Mostek, in turn, called Connors to verify the information regarding Yearwood. Although Connors could not name the DEA agent who had supplied the information or asked to search Yearwood's luggage, he did give Mostek the same information he had given Scheuler.

Scheuler testified that on the basis of the information Connors supplied, he suspected that the defendant might be transporting narcotics. Connors had provided reliable information to the DEA group at O'Hare before, and Los Angeles is a major source city for cocaine entering Chicago. Additionally, the DEA agent testified that people transporting narcotics often purchase tickets with cash shortly before the flight is scheduled to depart. This is because couriers do not want to create a paper trail by using a check or credit card, and cannot purchase tickets in advance, because they are often uncertain as to when they will be travelling. Couriers also frequently buy one-way tickets, because "drug transactions are very unpredictable," and they cannot be sure when they will leave the city. Transcript of August 6, 1992 Hearing ("Transcript") at 19. Finally, Scheuler testified that drug traffickers commonly use new bags. He explained that "(i)f something doesn't feel good or doesn't look right, then (couriers) are ready to go out and buy them." Transcript at 20.

Based on Connors' information, Scheuler, Mostek, and two other DEA agents waited for the defendant at the gate. Yearwood walked to the baggage claim, where he waited for his luggage. While Yearwood waited, he continually looked around at the people in the area. Both Scheuler and Mostek testified at the suppression hearing that he appeared to be engaging in counter-surveillance, that is, looking for law officers.

After checking its luggage tag, Yearwood retrieved the new-looking black canvas bag and left the terminal. He walked out through an airport door and turned to walk toward a taxicab stand. Scheuler and Mostek approached him from behind. Mostek, who was slightly ahead of Scheuler, was on Yearwood's left. While Mostek was still behind the defendant, he said, "Excuse me." Yearwood stopped and looked over his left shoulder. Mostek then walked up alongside him on his left, announced that he was a Chicago Police officer, and asked Yearwood if he could speak with him. Yearwood turned 90° to face Mostek, put his bag down, and answered "yes." Scheuler stood to the left of Mostek and the right of Yearwood during the ensuing interview.

Mostek asked Yearwood whether he had just arrived on a flight from Los Angeles. Yearwood said yes. When Mostek asked to see his plane ticket and some identification, Yearwood handed him his airplane ticket. The ticket was made out for David Harrison. It was a one-way ticket that had been paid for in cash. Mostek asked Yearwood if his name was David Harrison and Yearwood said yes. Mostek next asked for some identification. Yearwood handed him

---

1. Specifically, Yearwood claims that Judge Rosemond's conclusion is contrary to the facts, and that the Magistrate Judge improperly limit-ed cross-examination of government agents and permitted examination of the defendant.

a California driver's license bearing his picture and the name David Harrison Yearwood. When Mostek asked Yearwood if his name was David Harrison Yearwood, Yearwood again said yes, and, when asked why his ticket was in another name, offered that the ticket agent must have made a mistake. Yearwood added that he sometimes went by the name David Harrison.

Mostek asked whether the black canvas bag belonged to Yearwood, and Yearwood said yes. Mostek asked whether he had packed the bag himself. Yearwood said no, his cousin had packed the bag. Mostek asked Yearwood if he knew what was inside the bag, and defendant said no. Finally, Mostek asked whether the defendant would consent to a search of the bag for drugs, and Yearwood said yes.

When Mostek searched the bag, he found cocaine wrapped in fabric softener sheets,[2] saran wrap, and a pair of denim shorts.

Later that day, after Yearwood had been arrested and further interviewed at the DEA office in O'Hare, Mostek again spoke to Connors. At this time, Mostek learned that Connors had not, in fact, spoken directly with any DEA agent from Los Angeles, but had received his information from another American Airline employee at O'Hare named Ray Long ("Long"). Connors believed that Long had gotten the information from a DEA agent. Long, however, had actually gotten the information from a ticket agent in Los Angeles.

At the close of the suppression hearing, Magistrate Judge Rosemond concluded that Yearwood had consented to be interviewed by the agents and to allow his bag to be searched. In addition, the Magistrate Judge concluded that the agents had had legitimate advance basis for making an investigatory stop, although they did not choose that course. Accordingly, Magis-

trate Judge Rosemond denied Yearwood's motion to suppress evidence and statements.

## II.  DISCUSSION[3]

### A.  The Existence of Consent at the Outset of the Encounter

Yearwood objects to Magistrate Judge Rosemond's decision, arguing that it is contrary to the facts of the case and to the law of this circuit. It is well-established law in this circuit, however, that not all police questioning of individuals implicates the Fourth Amendment. *United States v. Borys*, 766 F.2d 304, 308 (7th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986). An encounter may be consensual. Moreover, the facts in this case support the Magistrate Judge's conclusion that both the encounter and the search were consensual.

In order to determine whether an encounter is consensual, a court must look at the totality of the circumstances to determine whether a reasonable person would feel he was free to leave. *United States v. Johnson*, 910 F.2d 1506, 1509 (7th Cir.1990) (citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). Some of the factors a court will consider are what types of questions the agents asked, how long the questioning lasted, where the encounter took place, and the physical positioning of the agents. Here, the questions that Mostek asked were not coercive questions. Instead, he began by simply asking Yearwood if he could see his airplane ticket and some identification. *See United States v. Sterling*, 909 F.2d 1078, 1082 (7th Cir.1990) (court noted that the mere request for and voluntary production of an airplane ticket

---

**2.**  Mostek testified that drug couriers frequently wrap narcotics in fabric softening sheets in order to throw drug-sniffing police dogs off the scent.

**3.**  Although Yearwood claims that the Magistrate Judge limited cross-examination of government agents and impermissibly permitted improper examination of the defendant, he fails to identify what cross-examination should have been

allowed, or what portions of his direct examination were improper. We can only assume that his current objections parallel the objections made by his counsel during the hearing. Since, absent further argument in the briefs, we find nothing improper in the examinations of either the agents or the defendant, we overrule the defendant's objections on these grounds and will not address them in our Discussion.

and driver's license constitutes a non-coercive encounter, rather than a seizure); *Borys*, 766 F.2d at 310 (court held that asking defendant for identification, ticket, name, and how long he had been in the city was not overly intrusive and did not create a seizure). These questions, then, which did not last long, did not change the nature of this consensual encounter.

Nor did the physical surroundings of the encounter transform it into a seizure. Mostek and Scheuler approached Yearwood just outside of an airport terminal. The Seventh Circuit has stated that "a reasonable person is less likely to feel the coercive pressure of law enforcement officers when the encounter takes place in a public place." *Id.* at 1083. (The court noted that foyers of airport terminals are non-coercive public places, and held that the baggage area at Midway Airport was also such a place.) Accordingly, the location of the encounter argues against the finding of a seizure.

Finally, when Yearwood stopped, put his bag down, and consented to speak with Mostek, the agent was on his left side, rather than blocking his path. In fact, Yearwood had to turn 90° to face him. Scheuler, moreover, was behind Mostek and to the right of Yearwood, when the defendant agreed to talk. Although Yearwood claims that the agents created a "picket fence" which prevented him from moving forward, any such positioning occurred after the initial stop and Yearwood's consent to the interview. *See Id.*, 909 F.2d at 1079-82 (court held that where agents approached defendant, stood at her side, and asked her if they could speak to her, this did not constitute a seizure). Accordingly, under the totality of the circumstances—the non-coercive arena of the air-port, the low-key nature of the request to speak, and the fact that neither agent was in uniform or displayed a weapon—the Magistrate Judge properly found the approach, identification, and initial questioning to be consensual.

### B. The Existence of Reasonable Suspicion During the Encounter

■ It may be that at some point, the interview with Yearwood progressed into an investigatory stop. *See, e.g., United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983); *Sterling*, 909 F.2d at 1083. An investigatory detention is something more than a consensual encounter and something less than a full-blown arrest. *See Borys*, 766 F.2d at 308. As such, it implicates the Fourth Amendment. Accordingly, in order to conduct an investigatory stop, an agent must have a reasonable suspicion of criminal activity. *Id.* at 308.

■ At the earliest, the encounter would have ripened into an investigatory stop when Mostek received, and failed to return, Yearwood's ticket and driver's license.[4] It was only at that point that Yearwood may reasonably have believed that he was not free to leave.[5] However, even if the agents had not had a reasonable suspicion of criminal activity when they first stopped Yearwood, they certainly had such a suspicion after perusing the ticket and license. Yearwood had tendered a ticket made out for David Harrison and had claimed that that was his name. Next, he had offered a driver's license with the name David Harrison Yearwood and claimed that that was his name. He then admitted that he went by both names. The use of an alias, combined with the information provided by Connors and corroborated upon Year-

---

**4.** While Mostek testified that he handed Yearwood the items right after he looked at them, Yearwood testified that the agent did not return his ticket or license during the initial interview. In the interest of ensuring the constitutionality of the stop, we will assume, *arguendo*, that Mostek kept the items.

**5.** In *Sterling*, the Seventh Circuit stated:
The standard employed in determining whether that initial, consensual interview ripened into an investigative detention is an objective one. '[A] person has been "seized" within the meaning of the Fourth Amendment ... only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'
909 F.2d at 1083 (citing, *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988).

wood's arrival at O'Hare, created a reasonable suspicion that Yearwood might be involved in criminal activity. Accordingly, even if the encounter had ripened into an investigatory stop, it did not violate the Fourth Amendment, because the agents had a reasonable basis for such a stop. *See Johnson,* 910 F.2d at 1510 (court noted that where defendant was travelling from the source city of Los Angeles, had purchased a ticket with cash, picked up the ticket twenty minutes before departure, appeared nervous, trembled when police approached for questioning, travelled under an assumed name, lied about possessing photo identification, and had an incorrect call-back number on her ticket, the police had sufficient reasonable suspicion to justify a seizure).

### C. The Existence of Reasonable Suspicion at the Outset of the Encounter

 Finally, we find that even if the agents' initial stop of Yearwood was not consensual, but implicated the Fourth Amendment as an investigatory stop, Mostek and Scheuler had a reasonable basis for suspicion of criminal activity at the time they first approached Yearwood. Mostek and Scheuler had received information from a reliable source, which they believed derived from the DEA in Los Angeles. Although in fact the information did not originate with a DEA agent, Mostek and Scheuler reasonably believed it did. Moreover, with the exception that it was a ticket agent, rather than a DEA agent, who tried to search Yearwood's bag in Los Angeles, the information was accurate.

The information, in turn, was sufficient to create a reasonable suspicion of criminal activity. Yearwood 1) arrived from the source city of Los Angeles, 2) purchased a one-way ticket, 3) used cash, 4) bought his ticket shortly before the departure of his flight, 5) appeared nervous, 6) carried a new-looking bag, 7) refused to allow his bag to be searched, and 8) repeatedly scanned the crowd at O'Hare. *See United States v. Jaramillo,* 891 F.2d 620 (7th Cir. 1989) (court found that where defendants arrived from a source city, purchased their

tickets in cash the same day of the flight, carried little luggage, scanned the airport in countersurveillance, took a suspicious path through the concourse, and tried to avoid detection by agents, there was reasonable suspicion to justify an investigatory stop). All of these facts were consistent with the transportation of narcotics and supported the suspicion that Yearwood might be a courier. Because Mostek and Scheuler had a reasonable suspicion that Yearwood might be transporting drugs, it was constitutionally permissible for them to conduct an investigatory stop of Yearwood, even though they chose to gain Yearwood's consent to a stop and search.

### IV. CONCLUSION

For the foregoing reasons, we adopt Magistrate Judge Rosemond's findings and overrule the defendant's objections. It is so ordered.