Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio


## OPINION

No. 04-09-00450-CR

Christina Jean **MILLER**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 216th Judicial District Court, Kerr County, Texas
Trial Court No. 08-341
Honorable N. Keith Williams, Judge Presiding

Opinion by:  Karen Angelini, Justice

Sitting:  Karen Angelini, Justice
Phylis J. Speedlin, Justice
Rebecca Simmons, Justice

Delivered and Filed:  March 30, 2011

AFFIRMED

Appellant Christina Jean Miller appeals the denial of her motion to suppress. We affirm.

### BACKGROUND

Miller was charged with possession of methamphetamine in an amount less than one gram. She filed a motion to suppress evidence obtained as a result of a warrantless search of her apartment. After the trial court denied her motion to suppress, she pled guilty to the offense and, pursuant to a plea-bargain agreement, was placed on deferred adjudication community

supervision for five years. She now appeals, arguing that the trial court should have granted her motion to suppress.

At the suppression hearing, Deputy Sheriff Jamie Yarborough testified that a little after midnight on May 8, 2008, he "was dispatched to a call in regards to a disturbance" at an apartment in Kerrville, Texas. According to Deputy Yarborough, someone had reported yelling, screaming, and objects being thrown inside the apartment. At the time of the call, Deputy Yarborough was giving a ride to Trooper Allen Meyer of the Texas Highway Patrol. Thus, both Deputy Yarborough and Trooper Meyer proceeded to the apartment complex in question. In addition, Deputy Michael Mitchell was dispatched to the apartment complex as back-up and arrived shortly after Deputy Yarborough and Trooper Meyer arrived.

Deputy Yarborough and Trooper Meyer approached the apartment in question. Deputy Yarborough testified that he could hear a female yelling and loud music playing from inside the apartment. When Deputy Yarborough knocked on the door of the apartment, he heard "more obscenities, yelling, and then objects being thrown at the door." Deputy Yarborough knocked once more, and a woman, later identified as Appellant Miller, answered the door. According to Deputy Yarborough, Miller appeared to be "extremely distraught and highly intoxicated." Miller was crying, and her tears were causing her makeup to smear. Deputy Yarborough smelled alcohol on Miller's breath and observed her stumbling while attempting to walk. According to Yarborough, Miller's speech was slurred.

Deputy Yarborough told Miller that he and Trooper Meyer were at her door because someone had reported yelling and possible violence at her apartment. According to Deputy Yarborough, Miller then said that they could come into her apartment. Upon entering the apartment, Deputy Yarborough saw items "kind of thrown around the house," like there had been

some sort of altercation. When he asked Miller what had happened, she said that she was upset at her boyfriend, who had been seeing other people. Miller would not tell Deputy Yarborough her boyfriend's name, but she did identify herself. Deputy Yarborough then called in Miller's information to dispatch to see if she had any outstanding warrants. According to Deputy Yarborough, Miller then asked him and Trooper Meyer to leave. Deputy Yarborough testified that they were planning to leave after dispatch called back with regard to the warrant check. However, before the return of the warrant check, Trooper Meyer "observed in plain view a long folded piece of tin foil with burned residue in the middle." There was also in plain view "a small, used marijuana cigarette, otherwise known as a roach." Deputy Yarborough testified that the tin foil with burned residue was significant because "it's commonly used to smoke or use methamphetamine and cocaine." According to Deputy Yarborough, when Trooper Meyer picked up the marijuana cigarette, Miller grabbed the cigarette out of his hand. Deputy Yarborough and Trooper Meyer had to forcibly remove the marijuana cigarette from Miller's grasp. When asked why she had reacted in such a manner, Miller admitted to having had smoked marijuana earlier in the day. Deputy Yarborough and Trooper Meyer then conducted a search around the immediate vicinity of Miller and found "two clear plastic baggies containing a small amount of white powdery substance," which were located in plain view on top of the microwave that was on top of the kitchen counter, "just next to where the tin foil was located." Miller was then arrested. The only other persons in her apartment were two children, an eleven year-old and a two year-old, who were asleep in another bedroom.

Deputy Mitchell testified as to the same sequence of events as Deputy Yarborough. When asked why he and the other officers did not leave when asked to by Miller, Deputy Mitchell testified as follows:

There were a couple of reasons. One, we had evidence [of] a disturbance when we came in, although [Miller] was not injured. There was a lot of property damage in the living room, stuff up-ended and scattered around. There was obviously some sort of physical disturbance there. We needed to finish investigating that. We needed to wait for the warrant check to come back. It is pretty standard for us to, when we're in contact with someone, [to wait] until we get the warrant check before we break contact with them.

Trooper Meyer also testified to the same sequence of events as Deputy Yarborough. When asked about the aluminum foil sitting on Miller's counter, Trooper Meyer testified that he saw "a long strip of aluminum foil" that "had been folded at about 45, 90 degrees, and had a crease in the middle of it." He also "noticed burnt residue on top of it." According to Trooper Meyer, from his experience, he "immediately recognized it as drug paraphernalia." Trooper Meyer testified that drug users "will take either meth or crack and they will sprinkle it across into the crease of the aluminum foil." "They will then take a lighter and cook [the meth or crack] underneath [the foil], and they will huff, what they call huffing." "Chasing the dragon is what it's called, and they will huff the fumes and get high on the fumes." Trooper Meyer explained that he had positioned himself between Miller and the kitchen for officer safety. According to Trooper Meyer, there were a lot of knives in the kitchen, and because Miller was so agitated, he was afraid she would try to get a weapon from the kitchen. According to Trooper Meyer, after picking up the tin foil, Miller tried to grab the tin foil away from him.

In addition to the testimony of the three officers, an audio recording of the encounter was admitted into evidence. The recording confirms that when the officers approach Miller's apartment, they hear yelling and objects being thrown at the wall. Deputy Yarborough then explains that the officers are at Miller's apartment because they had received a call complaining about a violent incident at the apartment. Miller gives consent to the officers to enter her apartment. She then tells the officers that her "babies" are present in her apartment and asks the

officers not to wake up the children. When an officer responds that the children were probably already awake, Miller responds that "they're used to it." Miller then explains that she is upset with her boyfriend because he is seeing other women. Deputy Yarborough then asks Miller where her boyfriend is. Miller replies that she does not know. She then tells the officers to leave.

The officers do not leave and continue to question Miller. Deputy Yarborough asks Miller again if anything violent happened at the apartment. Miller responds no and claims to have tripped over a bed frame. When Deputy Yarborough asks Miller her boyfriend's name, she responds that it is none of his business. Deputy Yarborough explains that it is his business because he is investigating possible violence at the apartment. Miller responds that she is not telling him her boyfriend's name. Deputy Yarborough then asks for Miller's name, and she responds with her name. At this point, three minutes had passed since the officers first entered Miller's apartment. Miller then asks the officers to leave again.

Deputy Yarborough explains that they will leave but that he needs to talk to her boyfriend to confirm Miller's story. Miller again says that she wants the officers to leave. Trooper Meyer explains to Miller that they will leave in a few minutes but that they have to complete a few obligations first. Deputy Yarborough then calls in Miller's name to dispatch while in the background Trooper Meyer is heard asking about Miller's boyfriend. Deputy Yarborough again states that they are just "trying to figure out what happened." At this point, about five minutes had passed since the officers entered the apartment. Miller again tells the officers to leave. Deputy Yarborough states that they will leave but they have to learn "certain things first." Then, less than six minutes after entering the apartment, the officers are heard yelling at Miller to drop the object she is attempting to grab. Thus, from the time the officers entered the apartment to the time Miller grabs the tin foil out of Trooper Meyer's hands, less than six minutes passed.

After the suppression hearing, the trial court denied Miller's motion to suppress. Miller then entered into a plea-bargain agreement and was sentenced in accordance with that agreement. She then appealed the trial court's denial of her motion to suppress to this Court. In her brief, Miller argued that because she filed a request for findings of fact with regard to her motion to suppress, the trial court erred in failing to enter such findings. We agreed, and abated and remanded this cause for findings. On remand, the trial court entered the following findings of fact:

1. On May 8, 2008, Kerr County Deputy Jamie Yarborough responded to a disturbance call at 815 Ranchero Road, Park Hill Apartments, Apt. No. 110, in Kerrville, Texas. Upon arrival, the deputy personally heard noises consistent with a disturbance coming from the apartment. The defendant, Christina Miller, eventually responded to the deputy's knocking on the door.

2. The defendant, Christina Miller, told the officers, including Deputy Yarborough, to enter the residence if they wanted to. Upon entering, the deputy found the defendant to be intoxicated, and the apartment to be in disarray, consistent with an altercation. The defendant did not appear to be injured. There were knives and scissors in the kitchen area of the apartment.

3. The deputy identified the defendant and called in to dispatch of [sic] a warrant check on the defendant. The defendant on four occasions asked the law enforcement officers to leave the premises after the warrant check had been requested and while they were waiting for the return.

4. While the deputy was speaking with the defendant, another officer, Trooper Allen Louis Meyer, who testified that he had stationed himself between the defendant and the kitchen area [for] officer safety, observed what appeared to be a folded piece of tin foil with burned residue in the middle, along with a used marijuana cigarette lying in plain view. Trooper Meyer testified that he immediately recognized the item as being drug paraphernalia. When Trooper Meyer attempted to pick up the said cigarette, the defendant grabbed the item out of his hand.

5. Another officer at the scene, Deputy Michael Mitchell, testified that the officers did not depart the premises immediately upon being requested to do so by the defendant based on the obvious physical disturbance that had occurred on the premises, and because of the standard procedure of waiting for a warrant return.

6. The officers handcuffed the defendant, recovered the said contraband, and asked her about same. The defendant then admitted smoking marijuana earlier in the day. A search was then conducted of the immediate area of the defendant, and the officers found within plain view two plastic baggies containing a white powdery substance.

7. The record is silent as to whether any other persons were known to have been in the other rooms or areas of the apartment at the time of the events described at the hearing; thus, the officers were not aware if a third party was present on the scene at the time of their investigation. Two children were finally determined to be asleep in a bedroom.

The trial court also entered the following conclusions of law:

1. There was sufficient basis for the law enforcement officers to enter the premises based on the consent of the defendant.

2. The officers were entitled to complete their investigation of the disturbance call, particularly when they could articulate hearing noises consistent with violent conduct, physical surrounding[s] consistent with violent activity, and the apparent intoxication of the occupant of such residence.

3. The officers were entitled to make a warrant check of the defendant, and further entitled to a reasonable amount of time in which to obtain the result of said check. The period herein was reasonable under the factual circumstance[s], and included the time when the contraband was located and seized.

4. All items of contraband were found in plain view within the apartment and were properly subject to seizure.

## DISCUSSION

In her first issue, Miller argues that her rights under the Fourth Amendment to the Constitution were violated when the officers refused to leave her apartment after she asked them to leave.[1] Miller concedes that she originally gave consent for the officers to enter, but argues that once she revoked her consent, the officers were required under the Constitution to leave her home. And, because the officers discovered the drug paraphernalia after she had withdrawn her consent, she argues that her motion to suppress should have been granted. We disagree.

We review a motion to suppress evidence ruling using a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). We give "almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Id.* (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). And we afford the same level of deference to a trial court's ruling on application of law to fact questions, or mixed questions of law and fact, if the resolution of those questions turns on an evaluation of credibility and demeanor. *Id.* If, as here, the trial court makes explicit findings of fact, we must determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). However, we review a trial court's legal ruling de novo, unless its fact findings, which are supported by the record, are dispositive of the legal ruling. *Id.* Finally, we will uphold a trial court's ruling on a motion to suppress if there is any valid theory of law applicable to the case, even if the trial court

---

[1] We note that Miller also cites to article 1, section 9 of the Texas Constitution. Miller, however, does not explain how the Texas Constitution provides more protection than the United States Constitution. Thus, to the extent that the Texas Constitution does provide more protection than the United States Constitution, Miller has inadequately briefed this issue. *See* TEX. R. APP. P. 38.1(i).

did not base its decision on that theory. *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002).

Warrantless searches and seizures are *per se* unreasonable unless they fall within a few narrowly defined exceptions. *See United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993). One such exception is when an individual consents to waive fourth amendment rights. *See Carmouche v. State*, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000). And, while it is true that Miller had the right to withdraw her consent, *see United States v. Ho*, 94 F.3d 932, 936 & n.5 (5th Cir. 1996), any information obtained by the officers between the time she had granted consent and revoked it could lead them to having a legal basis to remain. *See United States v. Sterling*, 909 F.2d 1078, 1083-84 (7th Cir. 1990) (holding that information obtained during a consensual interrogation, before consent was revoked by suspect, created a reasonable suspicion to detain the suspect for a non-consensual investigation of her luggage by a drug detection dog); *United States v. Newsome*, 124 F. Supp. 2d 1031, 1036-37 (E.D. Tex. 2000) (holding that observations made by officer, before consent was revoked by defendant, during consensual interrogation of the defendant led to officer having reasonable suspicion of narcotics-related activity to further detain the defendant for investigation). Here, the officers had a legal basis to remain under the emergency doctrine.

With regard to a residence, police officers may enter a residence without a warrant under the emergency doctrine exception to the Fourth Amendment. *See Laney v. State*, 117 S.W.3d 854, 861 (Tex. Crim. App. 2003). Under the emergency doctrine, an officer may enter a residence if he has an immediate, reasonable belief that he must act to protect or preserve life or avoid serious injury. *Id.* If the emergency doctrine applies, an officer may seize any evidence that is in the plain view during the course of his "legitimate emergency activities." *Id.* at 862.

Here, the record shows that the officers were dispatched to Miller's apartment because a disturbance had been reported. When they knocked on her door, they heard obscenities, yelling, and objects being thrown at the front door. Miller, who appeared to be highly distraught and intoxicated, consented to the officers entering her apartment and asked the officers not to wake her children who were sleeping. When the officers entered the apartment, they saw items scattered about, indicating that an altercation had occurred. When asked what had happened, Miller was vague, telling the officers that she was upset with her boyfriend because he was seeing other women. When Miller was asked where her boyfriend was, she replied that she did not know. Thus, before Miller revoked her consent, the officers had observed evidence indicating violent conduct and had observed Miller to be highly agitated and intoxicated. Further, the officers had been told by Miller that her children were in residence and did not have an adequate explanation from Miller about her boyfriend's whereabouts. Thus, at the moment Miller revoked her consent, the officers had reason to suspect that Miller and her children were in an unsafe environment. The officers did not know whether the boyfriend was still present and hiding in the apartment, or whether he had left the apartment, but might return once the officers left the apartment. Therefore, before Miller revoked her consent, the officers had gained information that allowed them to remain at the residence under the emergency doctrine exception to the Fourth Amendment. *See id.* Thus, under the emergency doctrine, the officers were lawfully in Miller's residence when Trooper Meyer saw drug paraphernalia in plain view. *See id.*

Miller also argues that the trial court erred in denying her motion to suppress because the officers violated the Texas criminal trespass law in seizing the evidence. In support of her argument, Miller relies on this Court's opinion in *State v. Hobbs*, 824 S.W.2d 317 (Tex. App.— San Antonio 1992, pet. ref'd). In *Hobbs*, after receiving a tip that the defendant was growing

marijuana on his ranch, an officer crossed a fence, which had a posted "No Trespassing" sign, and discovered some marijuana plants on the ranch. *Id.* at 318. On appeal, the state conceded that the subsequent search warrant had been issued based on information obtained as a result of the two trespasses in violation of section 30.05 of the Penal Code. *Id.* at 319. Nevertheless, the state argued that the trespass laws did not apply to law enforcement officials acting in their official capacities. *Id.* This Court rejected the state's argument and held that the evidence obtained should have been suppressed under Texas's exclusionary rule, because in obtaining the information needed for the warrant, the officer had violated Texas's trespass law. *Id.* Here, however, the officers entered Miller's apartment pursuant to her consent. And, at the time Miller revoked her consent, the officers were lawfully entitled to remain under the emergency doctrine. Therefore, we find *Hobbs* distinguishable.

In 2006, in a case in which an estranged wife gave consent to search the marital residence, while the husband who was also present unequivocally refused to give consent, the Supreme Court distinguished two different issues: when the police may enter to search for evidence, and when they may enter without committing a trespass. *Georgia v. Randolph*, 547 U.S. 103, 118 (2006). In doing so, the Court wrote the following, which is particularly relevant to this case:

> Nor should this established policy of Fourth Amendment law be undermined by the principal dissent's claim that it shields spousal abusers and other violent co-tenants who will refuse to allow the police to enter a dwelling when their victims ask the police for help. It is not that the dissent exaggerates violence in the home; we recognize that domestic abuse is a serious problem in the United States. But this case has no bearing on the capacity of the police to protect domestic victims. The dissent's argument rests on the failure to distinguish two different issues: *when the police may enter without committing a trespass*, and when the police may enter to search for evidence. No question has been raised, *or reasonably could be, about the authority of the police to enter a*

*dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering*, say to give a complaining tenant the opportunity to collect belongings and get out safely, *or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur*, however much a spouse or other co-tenant objected. *(And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause.)* Thus, *the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes.* The undoubted right of the police to enter in order to protect a victim, however, has nothing to do with the question in this case, whether a search with the consent of one co-tenant is good against another, standing at the door and expressly refusing consent.

*Id.* at 118-19 (citations omitted) (emphasis added). We hold that because the officers were lawfully entitled to remain in Miller's residence, the trial court did not err in denying Miller's motion to suppress.

## CONCLUSION

Having determined that the trial court did not err in denying Miller's motion to suppress, we affirm the judgment of the trial court.

Karen Angelini, Justice

Publish