

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0705-11

**CHRISTINA JEAN MILLER, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE FOURTH COURT OF APPEALS
## KERR COUNTY

JOHNSON, J., delivered the opinion of the Court in which MEYERS, PRICE, KEASLER, COCHRAN, and ALCALÁ, JJ., joined. KELLER, P.J., filed a dissenting opinion in which HERVEY, J., joined. WOMACK, J., concurred.

## O P I N I O N

Sheriff's deputies arrested appellant for possession of a controlled substance. She filed a motion to suppress, alleging that the controlled substance was illegally obtained as the result of a warrantless search of her apartment. The trial judge held a hearing and denied relief, and appellant then plead guilty pursuant to a plea bargain. On appeal, appellant challenged the trial judge's denial of her motion to suppress. The court of appeals affirmed the ruling of the trial court. *Miller v. State*,

345 S.W.3d 616 (Tex. App.—San Antonio 2011). We reverse the court of appeals's judgment.

Appellant raises three issues in her Petition for Discretionary Review.

1. The Fourth Court of Appeals erred in holding that a warrantless search was justified under the emergency doctrine when the emergency doctrine was not a theory urged by the State at the suppression hearing and when there was no evidence presented at the suppression hearing that officers remained in Appellant's home pursuant to the emergency doctrine.

2. Are law enforcement officers justified in remaining in a person's residence without a warrant under the guise of conducting a "warrant check" after the homeowner unequivocally tells officers to leave the residence?

3. When law enforcement officers remain in a person's residence without a warrant under the guise of conducting a warrant check after the homeowner unequivocally tells officers to leave the residence, are they committing the offense of Criminal Trespass which would render any evidence seized after the intrusion inadmissible?

**Facts**

Just after 12:30 a.m. on May 8, 2008, two sheriff's deputies responded to a disturbance call from a third party, who reported yelling, screaming, and the sounds of objects being thrown in appellant's apartment. The deputies heard similar sounds when they arrived at the scene. The events that occurred after the officers arrived were recorded on the camera in Deputy Jamie Yarborough's parked police car (state's exhibit 3), with audio input from his body microphone, and a second recording in Deputy Michael Mitchell's parked police car, with audio input from his body microphone (state's exhibit 2). DVDs of both recordings were admitted into evidence at the hearing on appellant's motion to suppress.

**The Chronology of Events**

(00:38:01)[1] The deputies and DPS Trooper Allen Meyer, who was riding with Yarborough,

---

[1] All times mark the beginning of the cited event and are taken from Deputy Yarborough's DVD (State's Exhibit 3), plus or minus three seconds. Deputy Mitchell's DVD does not show the time.

knocked on appellant's door. Appellant did not immediately answer the door.

(00:38:05) (Crashing noises, loud music, and yelling by a single female voice are audible.)

(00:38:10) Officers announced that they were sheriff's deputies.

(00:38:17) Yarborough asked Meyer if "[you] think she thinks it's him."[2]

(00:38:22) Appellant opened the door, appearing to the officers to be "extremely distraught and highly intoxicated," stumbling as she walked and slurring her speech. R.R. 9-10. Both Yarborough and Mitchell testified at the hearing that they did not see any injuries on appellant. R.R. 12, 26.[3]

(00:38:26) She asked what they wanted, they mentioned the third-party report, and she then said, "Y'all can come in if you want." (00:38:41)

(00:38:45) Deputy Yarborough asked if her boyfriend was at home. She said that he was not.

(00:39:15) Appellant denied that there had been any domestic violence. She explained that she was upset and was throwing things because she had discovered that her boyfriend was seeing other women, but that he was not there and she did not know where he was.

(00:39:44) When queried about who was in the apartment, she told the officers that the only other people in her home were "her babies," who were asleep and asked that the officers "please don't mess with them."

(00:39:44) Deputy Yarborough responded that they were probably already awake.

(00:40:25) Appellant again told Deputy Yarborough that there had been no physical violence.

(00:40:54) She refused to identify her boyfriend.

(00:41:04) She identified herself as Christie Miller.

(00:41:11) Deputy Yarborough asks for appellant's driver's license as identification and her birth date.

(00:41:25) Appellant gave her date of birth.

---

[2] This seems to be a reference to appellant's boyfriend.

[3] All record references are to the record from the suppression hearing on November 20, 2008.

(00:41:38) Appellant told the officers that she's upset, she's in her own home minding her own business, and she wants them to go saying, "I just want you all to go." They did not leave.

(00:41:42) Deputy Yarborough asserted that they had a report of people throwing things at each other and hitting on each other.[4]

(00:41:46) Appellant again denied it: "None of that happened."

(00:41:50) Deputy Yarborough again pressed for the boyfriend's name because "I need to confirm that with him. That's why I need to talk to him."

(00:42:18) About four minutes after the officers first entered, she told them to leave for the second time: "I would like it if y'all please would leave."

(00:42:22) Either Deputy Mitchell or Trooper Meyer said, "Christie, we'll leave in just a minute, but we have some obligations we have to go through." They did not leave.

(00:42:40) Deputy Yarborough called for a warrant check.

(00:43:02) Appellant said, "I didn't authorize you to come in my house."

(00:43:05) Yarborough responded that she had asked them to "come in and check." *Miller*, 345 S.W.3d at 620.[5]

(00:43:16) Appellant tells the officers to leave for a third time: "Well then, please leave. Please leave."

(00:43:25) An officer other than Deputy Yarborough said, "We have certain things we need to go through before we can leave." *Id*. The officers did not leave and continued to question her.

(00:43:30) Appellant's fourth request that the officers leave, about 15 seconds after her third request, was considerably less polite than her first three: "Get out of my f***ing house!" Both deputies testified that, at the time of the fourth request that they leave, they had no probable cause to arrest appellant. R.R. 16, 25.

(00:43:34) An officer other than Deputy Yarborough again pressed for the boyfriend's name.

(00:43:41) After appellant's fourth instruction for the officers to leave, the sounds of a

---

[4] The third-party disturbance call mentioned only noises heard by the informant. No visual information was asserted. R.R. 8.

[5] According to the DVD (00:38:41: "Y'all can come in if you want.") and Yarborough's testimony (R.R. 10: "she advised us to go ahead and enter into her residence"), that response was not entirely accurate.

struggle are heard on the audio recording. This corresponds to testimony at trial that, while waiting inside appellant's apartment for the results of the warrant check, Trooper Meyer saw a small, burned marijuana cigarette and a piece of aluminum foil with burned residue in the center,[6] appellant snatched the marijuana cigarette away from Meyer, and Yarborough and Meyer forcibly retrieved it from her hand. R.R. 12-13, 33-34.

(00:44:14) The officers arrested appellant. (Sound of handcuffs closing)

(00:44:24) She admitted to them that she had smoked marijuana earlier in the week.

(00:44:30) (Sounds of drawers opening and closing)

According to testimony at trial, after arresting appellant, the officers searched further and found, near the folded foil and in plain sight, two baggies, each containing traces of a white powdery substance. R.R. 14, 31.

As appellant had told the officers, her boyfriend was not there, and the only other occupants of the apartment were appellant's children, ages eleven and two, who were asleep in another room until the struggle over the foil awakened the older child. Between appellant's first request that the officers leave her home and her arrest, she told them to leave three additional times within five minutes. They left only after searching her apartment and arresting her. Appellant was initially charged with possession of drug paraphernalia (the foil). A charge of possession of a controlled substance in an amount of less than one gram was added later.[7]

**The Testimony at the Hearing on the Motion to Suppress**

---

[6] At the suppression hearing, he testified that he thought that the foil was significant because it is commonly used to smoke controlled substances.

[7] There is no indication as to the exact amount, but some information is available from Deputy Mitchell's recording and from the record from the hearing. Deputy Yarborough testified that they "located two clear plastic baggies containing a small amount of white powdery substance. At that time it was not enough for us to really do a field test on it to ascertain what kind of drug it was . . .." This seems to be corroborated by Deputy Mitchell's recording of a radio conversation that he had with an unknown person, during which he indicated that he didn't want to do a field test because it would destroy the sample.

The record of the suppression hearing reflects that the officers did not have a search warrant (R.R. 4 (noted by the trial court), R.R. 15-16 (Yarborough), R.R. 32 (Trooper Meyer)) and no consent to search, only consent to enter (R.R. 10 Yarborough). Deputy Yarborough testified, "We were awaiting the return for warrant checks and such. She had asked us to leave and pending the return from the warrant checks, we were planning on going ahead and leaving the residence." R.R. 12. He also testified that he did not see any visible injuries on appellant. *Id.* On cross-examination, he conceded that, before any probable cause to arrest existed, appellant had asked the officers to leave four times.[8] He also testified that the foil was burnt in the center and that: he did not see any drugs on it, R.R. 17; the warrant check could have been conducted outside of appellant's apartment after she asked them to leave; and he did not think that she was going to leave her apartment at that time.

The state asked Deputy Mitchell why they did not leave when asked. He responded,

> "[W]e had evidence that "a disturbance when we came in, although she was not injured. . . . There was obviously some sort of physical disturbance there. We needed to finish investigating that. We needed to wait for the warrant check to come back. It is pretty standard for us to, when we're in contact with someone, await until we get the warrant check before we break contact with them."

R.R. 22-23.

Defense counsel questioned Deputy Mitchell about staying in the apartment while waiting for a return on the warrant check.

> Q    Okay. Why didn't y'all leave? She asked y'all four times to leave. Why couldn't y'all walk outside and do the warrant check outside?

---

[8]    Defense counsel pressed for details about the requests to leave: "She asked you nicely three times; is that right? Deputy Yarborough replied: "I wouldn't call it nicely, sir." R.R. 16. His response is contradicted by the audio from DVD in his patrol car, which reflects three polite requests for the officers to leave. Defense counsel and officer agreed that the fourth request used "more assertive" words. *Id.*

A     Because if she would have come back with a warrant, that would have necessitated getting back into the house to arrest her with a warrant. It's normal procedure for us to wait until the warrant runs come back before we leave.

Q     Okay. Are you aware that you can enter a house, a person's residence, if they have an arrest warrant, without any type of search warrant?

A     Depending on the warrant, yes.

Q     Okay.

A     But not necessarily every warrant.

Q     So if she would have had an arrest warrant out there, you wouldn't need a search warrant to come in that house, wouldn't [sic] you?

A     We certainly wouldn't want to break in the door.

Q     Okay, but you wouldn't need a search warrant, would you?

A     A search warrant, not necessarily.

Q     Okay.

A     I mean, it depends on the type of warrant, to be honest.

Q     Okay, and so when you're in the house and she asks you to leave four times, y'all had not developed any probable cause to enter that house at that time; is that right?

A     Developed any probable cause to enter the house?

Q     Right, or to be at that location.

A     We had evidence of a disturbance in the house. There was a lot of property damage. I mean, it wasn't that the complaint was totally without substance.

Q     Okay.

A     But as far as probable cause to arrest her or anything, no.

R.R. 24-25.

Deputy Mitchell also testified that he saw no physical injuries on appellant and that no

emergency situation, such as destruction of evidence, existed at the time of any of her four requests for them to leave. R.R. 26. He agreed that there was no search warrant,[9] then attempted to qualify his answer by saying that they didn't know whether there was a search warrant because the warrant check had not come back.[10]

## The Court of Appeals's Opinion

The issue raised in the suppression hearing was the ability of appellant to revoke her consent for the officers to enter her residence. The court of appeals correctly noted that the admittedly warrantless search was *per se* unreasonable unless it fell within "a few narrowly defined exceptions." *State v. Miller,* 345 S.W.3d 616, 622 (Tex. App.—San Antonio 2011). It also correctly noted the standards of review: we give almost total deference to a trial court's determination of the historical facts that are supported by the record, particularly if the findings of fact are based on credibility and demeanor; the same level of deference is accorded application of law to the facts, especially when

---

[9] Warrant checks typically reveal arrest warrants from other jurisdictions, but do not contain information about search warrants.

[10] Defense counsel continued his cross-examination with questions about the validity of appellant's consent to enter.

Q    And you state that my client was highly intoxicated; is that right?
A    Yes, sir, she was.
Q    Okay, and you actually called the investigator to determine and y'all were having conversation about whether or not she could give consent to a search or not; is that right? Do you recall that on the video?
A    I don't recall that. I recall talking with the investigator, but I don't remember the exact conversation.
Q    Okay, and if somebody is highly intoxicated, would you feel comfortable getting their consent to search anything?
A    It would depend on the case.

R.R. 27.

This exchange seems to be based on Mitchell's side of a radio conversation he had with an unidentified person named Matt. After her arrest, appellant had challenged the officers to search her apartment "up and down," saying that they wouldn't find any drugs. Near the end of his conversation with Matt, Mitchell said, "You're gonna have consent issues 'cuz of custodial and her level of intoxication." In context, the consent issue appears to be connected to appellant's post-arrest challenge to the officers, not to the initial entry or any evidence in plain view.

the findings are based on credibility; legal rulings are viewed *de novo*; and we will uphold a trial court's ruling on any valid theory of law that is applicable to the case. *Id*. at 622.

Citing the emergency doctrine, the court of appeals found that the officers had consent to enter and, having entered, "observed evidence indicating violent conduct," and "observed Miller to be highly agitated and intoxicated." *Id.* at 623. The court of appeals further stated that the officers knew that appellant's children were in the apartment but that they

> did not have an adequate explanation from Miller about her boyfriend's whereabouts. Thus, at the moment Miller revoked her consent, the officers had reason to suspect that Miller and her children were in an unsafe environment. The officers did not know whether the boyfriend was still present and hiding in the apartment, or whether he had left the apartment, but might return once the officers left the apartment. Therefore, before Miller revoked her consent, the officers had gained information that allowed them to remain at the residence under the emergency doctrine exception to the Fourth Amendment. Thus, under the emergency doctrine, the officers were lawfully in Miller's residence when Trooper Meyer saw drug paraphernalia in plain view.

*Id.* (internal citations omitted).

Appellant's second issue in the court of appeals asserted that, by remaining after her four requests for them to leave, the officers committed the offense of criminal trespass and therefore, any evidence seized after her request was obtained in violation of state law and must be suppressed pursuant to Tex. Code. Crim. Proc. art. 38.23.[11] The court of appeals overruled that issue, finding that the opinion of the United States Supreme Court in *Georgia v. Randolph*, 547 U.S. 103 (2006) was dispositive.

No question has been raised, or reasonably could be, about the authority of the police

---

[11] "Article 38.23. Evidence not to be used. (a) No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." Section (b) provides that an exception exists if the evidence was obtained by law-enforcement officers acting in good faith reliance on a warrant issued by a neutral magistrate based on probable cause. In this case, the parties agree that the entry and search were without warrant, thus the exception does not apply here.

to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say to give a complaining tenant the opportunity to collect belongs and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected. (And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause.)

*Id.* at 624, *quoting Georgia v. Randolph.*

**Analysis**

As the court of appeals noted, we give almost total deference to a trial court's determination of the historical facts that are supported by the record, particularly if the findings of fact are based on credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). We give the same level of deference in reviewing a trial court's application of law to the facts or to mixed questions of law and fact, especially when the findings are based on credibility and are supported by the record. *Id.* When the trial court makes explicit findings of fact, we consider, in the light most favorable to the trial court's ruling, whether the record supports those findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We review legal rulings *de novo* unless the trial court's findings that are supported by the record are dispositive. *Id*. The recurring requirement in each of these standards of review is that deference is due only if the trial court's rulings are supported by the record.

If a trial court's ruling is supported by the record, we will affirm that ruling if there is any valid theory of law that supports the ruling, even if that theory was not presented to the trial court. *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002.). "In reviewing a trial court's ruling on a motion to suppress, appellate courts must afford great deference to the trial court's findings of historical facts as long as the record supports those findings." *Tucker v. State*, 369 S.W.3d 179, 184

(Tex. Crim. App. 2012) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); "However, in order to determine whether the evidence supports the trial court's implicit finding, the court of appeals must take all of the evidence, including the video, into account."); *Groves v. State*, 837 S.W.2d 103, 106 (Tex. Crim. App. 1992) ("Though we defer to a trial court's factual findings when they are supported by the record, we conclude that the record does not support the trial court's finding . . .."

"When there are factual disputes regarding testimony or the contents of a videotape, the trial court's findings of historical fact are afforded almost total deference. But when evidence is conclusive, such as a written and signed agreed stipulation of evidence or 'indisputable visual evidence,' then any trial-court findings inconsistent with that conclusive evidence may be disregarded as unsupported by the record, even when that record is viewed in a light most favorable to the trial court's ruling." *Tucker v. State,* 369 S.W.3d at 187 (Tex. Crim. App. 2012) (Alcalá, J., concurring); *see also Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000) ("[T]he nature of the evidence presented in the videotape does not pivot 'on an evaluation of credibility and demeanor.' Rather, the videotape presents indisputable visual evidence contradicting essential portions of [the officer's] testimony. In these narrow circumstances, we cannot blind ourselves to the videotape evidence simply because [the officer's] testimony may, by itself, be read to support the Court of Appeals' holding.").

In a number of instances, the trial court's seven findings of fact and four conclusions of law, wholly or in part, are not supported by the record as reflected in the two recordings of the events and

the testimony of the officers.[12]  In its second finding, the trial court states that the officers found "the apartment to be in disarray, consistent with an altercation."[13]  "Altercation" is defined as "a heated or angry dispute; noisy argument or controversy."  Webster's Encyclopedic Unabridged Dictionary of the English Language 43 (Gramercy Books 1989).  We note that both definitions require participation by a minimum of two persons.

No one disputes that the apartment was "in disarray," but the trial court and the officers appear to have concluded that the disarray must have resulted from domestic violence, even if, as the officers testified and the trial court found, appellant had no visible injuries and denied any physical contact with her boyfriend.[14]  The record reflects that, when he first arrived at appellant's door, Deputy Yarborough was approaching the situation as a domestic assault, already seemingly having decided, before any contact with appellant, that the third-party report of yelling, screaming, and the sounds of objects being thrown in appellant's apartment were the sounds of domestic assault, a not unreasonable conclusion.  But somewhat contradictorily, he also appears to have assumed that

---

[12]  The *Tucker* Court noted that a "video was admitted into evidence but was not viewed by the trial court, and was therefore not used as the basis for any findings, determinations, or rulings," but that deference remains the correct standard of review.  The record here is unclear as to whether, before making its findings of fact and conclusions of law, the trial court viewed the two DVDs that contained the recordings made by Deputies Yarborough and Mitchell during the events of May 8, 2008.  At the end of the hearing on the motion to suppress, the trial court stated, "Okay, so we will reschedule this for December 18th at 8:30 a.m. and if you have any cases, I'll look at the recordings."  The record before this Court does not reveal if the trial court ever viewed the DVDs that were admitted into evidence and are part of the appellate record.

[13]  This finding also states that appellant initially gave consent to enter, that she was intoxicated but did not appear to be injured, and that there were knives and scissors in the kitchen area.

[14]  In its brief, the state impliedly concedes that this bias existed from the very beginning of the officers' encounter with appellant.  "Deputy Yarborough then told Appellant that he was there because of a disturbance and possibly family violence at the residence. . . .  Upon entering the residence, Deputy Yarborough saw that objects were thrown around the residence such that some sort of altercation took place in the residence. . . .  Both Deputies Yarborough and Mitchell testified that they both believed that some type of physical altercation occurred in the residence. . . . Both Deputies Yarborough and Mitchell testified that they began investigating the situation as an assault matter. "  State's brief at 3-4.

the perpetrator had left and that appellant might think that the perpetrator had returned.[15]

His assumptions colored his behavior throughout his interactions with appellant. Appellant repeatedly said that she was upset because her boyfriend was cheating on her, but there is nothing in the record that reveals how or when she found that out–in person from him or by the grapevine, e-mail, or telephone. She also told the officers that the boyfriend was not there and that she did not know where he was. The officers clearly believed her as to the boyfriend's absence, as they made no attempt to search the apartment for him or anyone else. Yet, long after it had become clear that no domestic violence had occurred that evening, Deputy Yarborough continued to treat the situation as a domestic assault, pressing appellant for her boyfriend's name and whereabouts, even after several denials of physical contact or knowledge of the boyfriend's location and with no evidence of physical harm.[16]

The trial court's second conclusion states that "[t]he officers were entitled to complete their investigation of the disturbance call, particularly when they could articulate hearing noises consistent with violent conduct, physical surroundings consistent with violent activity, and the apparent intoxication of the occupant of such residence." While officers are clearly entitled to complete their investigation of a situation that may involve domestic violence, and the record here supports a

---

[15] Yarborough heard, as he approached appellant's door, the same sounds that the third party had reported. He said to Trooper Meyer, "[You] think she thinks it's him?" The recordings reflect vocalizations by a single, female voice.

[16] He continued to insist, "I need to confirm that with him. That's why I need to talk to him."

The assumption of domestic violence continued in the court of appeals with, among other things, its finding that the officers "saw items scattered about, indicating that an altercation had occurred. . . . Thus, before Miller revoked her consent, the officers had observed evidence indicating violent assault . . .. Further, the officers . . . did not have an adequate explanation from Miller about her boyfriend's whereabouts." 345 S.W.3d at 623.

The court of appeals does not explain why property damage should be assumed to be the result of a violent assault, nor does it say why appellant should be required to know where her errant boyfriend might be or why such lack of knowledge is an indication that her home is an "unsafe place."

conclusion that such an investigation was appropriate, the record does not support a conclusion that the noises that the officers heard before making contact with appellant, the "disarray" in her apartment, or her intoxication in her own home justified the officers' continuing presence once their investigation of possible domestic violence had been completed.

The trial court's seventh finding states, "The record is silent as to whether any other persons were known to have been in the other rooms or areas of the apartment at the time of the events described at the hearing; thus the officers were not aware if a third party was present on the scene at the time of their investigation. Two children were finally determined to be asleep in a bedroom." This finding is both internally inconsistent and largely contradicted by the record.

### The Emergency Doctrine

The court of appeals invoked the emergency doctrine[17] to justify the officers' continued presence in the apartment, saying that the "officers did not know whether the boyfriend was still present and hiding in the apartment, or whether he had left the apartment, but might return once the officers left the apartment," thereby adopting the officers' assumption of domestic violence as the cause of the disarray and finding that appellant and her children "were in an unsafe environment."[18]

The recordings reveal, however, that the officers recognized upon entry that appellant was the only adult present. They accepted her assurances that the only other persons in the apartment were her "babies" and made no attempt to search the apartment for her boyfriend or her children, thereby making clear that they perceived no emergency that would require remaining in appellant's

---

[17] "Under the emergency doctrine, an officer may enter a residence if he has an immediate, reasonable belief that he must act to protect or preserve life or avoid serious injury. If the emergency doctrine applies, an officer may seize any evidence that is in the plain view during the course of his legitimate emergency activities." *Miller* at 622 (internal citations omitted).

[18] *Id.*

apartment in order "to protect or preserve life or avoid serious injury,"[19] and Deputy Mitchell testified that no other emergency situation, such as destruction of evidence, existed at any of the four times at which appellant told the officers to leave her home. Based on the record before us, the court of appeals erred when it found that the officers' presence was justified under the emergency doctrine. We sustain appellant's first ground for appeal and consider whether the officers' continued presence is justified under another theory of law.[20]

## Consent and Revocation of Consent

Appellant's second and third grounds question the officers' assertions that they appropriately remained in appellant's apartment after four requests that they depart because they had not yet received the results of the warrant check. It is undisputed that appellant consented to the initial entry by the officers, but it is also undisputed that such consent may be limited or revoked. "If an officer is invited or permitted to come into a house for a particular purpose (such as to look for a particular person or object), the scope of the consent to enter normally includes consent to search those areas in which the person or object would reasonably be found. But the person who consents to the entry

---

[19] *Id.*

[20] Again, the record does not support some or all of the trial court's findings of fact and conclusions of law, and others are not germane to the issues raised in this Court. The trial court's first conclusion correctly states that the officers had consent to enter appellant's apartment, but the second finding perpetuates the assumption that, given "noises consistent with violent activity [and] physical surroundings consistent with violent activity," the violent activity was domestic violence.

The trial court's second finding states that, as is often true, there were knives and scissors in the kitchen area of the apartment, and Trooper Meyer testified that he moved into that area for officer protection because he "felt she could go towards the kitchen and get maybe a weapon or something." Yet there is no evidence in the record of appellant's proximity to the kitchen or whether that area was within appellant's "lunge area" such that she could obtain such items and use them against the officers.

The sixth finding states that appellant admitted smoking marijuana earlier in the day, yet the recordings clearly reveal that she admitted smoking marijuana only earlier that week and twice in the last month, and all discussion about drug use took place after both the fourth request that the officers leave and the recovery of the burnt foil.

may specifically limit or revoke his consent." *Valtierra v. State*, 310 S.W.3d 442, 450 (Tex. Crim. App. 2010). While conceding that consent may be revoked, the state does not address the issue of appellant's repeated revocation of her consent to enter and its relevance to the issue before this Court.

In its third conclusion of law, the trial court stated that the officers were entitled to make a warrant check of appellant and to a reasonable amount of time to obtain the results. However correct that finding may be, it does not address the critical issue here: Were the officers "entitled" to remain in the apartment in spite of appellant's revocation of her consent and her repeated objections to their continuing presence while they waited for the results?

The trial court's fourth finding correctly states that the contraband was found in plain sight, but such a finding does not address the two-pronged showing required by the plain-view seizure doctrine: "(1) that law enforcement officials see an item in plain view at a vantage point where they have the right to be, and (2) it is immediately apparent that the item seized constitutes evidence–that is, there is probable cause to associate the item with criminal activity." *Martinez v. State,* 17 S.W.3d 677, 685 (Tex. Crim. App. 2000). Trooper Meyer testified that he immediately recognized the foil as drug paraphernalia, but the issue here is not recognition, but whether, after appellant's fourth request for the officers to leave, he was at a vantage point where he had a right to be.

The trial court's fact findings and conclusions of law state that the officers' presence in the apartment at the time they found the illegal substance was permissible as part of their investigation for domestic violence. But the record does not support this. Although it is undisputed that the officers' initial entry into the apartment was part of their investigation for domestic violence, it is also undisputed that they found no evidence of domestic abuse, appellant told them to leave four

times, and the only reason that they did not leave was because they were waiting for a return on the warrant check on appellant. The officers' explanation for refusing to leave before they received the warrant check was, essentially, "But we always do it that way."[21] This is insufficient justification for their continued presence, as is the state's argument that remaining in appellant's apartment was appropriate because the entire encounter was very short–under six minutes.

The state's brief suggests that the warrant check was part of the officers' domestic- violence investigation; they wanted to determine whether there was a protective order in place. No evidence, however, explains why a warrant check on the appellant would provide information about a protective order and, in their testimony, the officers never mentioned checking, or wanting to check, for a protective order.

The state's entire argument on appellant's second and third grounds is based on "the statutory obligations of law enforcement officers to investigate domestic violence and protect victims." Certainly, law-enforcement officers should investigate allegations of domestic violence and protect victims, but if such an investigation reveals that domestic violence was not involved and that there are no victims to protect, officers no longer have a sufficient legal basis for remaining in a residence over the objections of the resident.

The officers testified that, upon the initial, consensual entry into appellant's apartment, they found an upset and intoxicated woman who had damaged her own property, in her own home, in a fit of temper.[22] Appellant told the officers at the beginning of their investigation that she was the

---

[21] "It's normal procedure for us to wait until the warrant runs come back before we leave." R.R. 24.

[22] The state asserts that appellant told the officers that "she had a dispute with her boyfriend." State's brief at 14-15. What she actually said was that she was angry with her boyfriend for cheating on her. Like an altercation, a dispute requires communications involving at least two persons. There is no evidence that her boyfriend even knew that she knew about his infidelity.

only adult present and repeatedly told them that there had been no domestic violence that night, only an angry outburst provoked by learning of her boyfriend's perfidy. It is undisputed that officers observed no signs of injury to appellant and that they did not attempt to verify her statements for themselves by searching the apartment for other adults or by checking to see that her children were safe and asleep. By their actions, or inaction, the officers indicated that their investigation of possible domestic violence was complete. Because their investigation was complete, the only legal basis for their continued presence in appellant's home rested on her consent, which she revoked on four separate occasions.

Neither did the officers dispute that they could have waited for the warrant check outside the apartment or that, had the check revealed an outstanding warrant, that they could have legally reentered appellant's apartment, even without her consent. The state asserts that the instant circumstances are analogous to traffic stops and should be treated the same way. "As with detentions of motorists who are stopped for traffic violations, peace officers should be allowed to detain individuals to await on basic dispatch returns, driver's license checks and warrant returns." State's brief at 12. This analogy ignores the fact that, unlike a person stopped for a traffic violation, appellant was not "detained" for any violation of any law and, as conceded by the officers, they had no probable cause to detain her. Nor, during warrant checks on traffic stops, does the officer enter and remain in the subject's vehicle. Even more importantly, the analogy fails to acknowledge that the expectation of privacy in one's home vastly outweighs the corresponding expectation of privacy in one's vehicle while the vehicle is in a public place.

We conclude that the trial court's factual finding that the police presence in the appellant's apartment was part of a reasonable domestic-violence investigation is accurate with respect to the

officers' initial entry, but it does not support a legal conclusion that the officers were still completing their investigation of domestic violence at the time they remained in appellant's apartment while waiting for a return on the warrant check and at the time that the illegal substance was found. At that point, the appellant had told them four times to leave, and the officers, by their own admission, were planning to leave the apartment after the results of the warrant check came back because their domestic-violence investigation had been completed.

We hold that appellant had revoked her consent to enter, the officers had no probable cause to arrest her until after the fourth iteration of her revocation of consent, and that, by remaining in her apartment, the officers were not at a vantage point where they had the right to be. The trial court should have granted appellant's motion to suppress, and the court of appeals erred when it affirmed the trial court's denial of that motion. We sustain appellant's second ground.

Appellant asserts in her third issue that, by remaining after she repeatedly asked them to leave, the officers committed the offense of criminal trespass, and therefore, the evidence of drug possession was obtained in violation of Tex. Code Crim. Proc. art. 38.23. The state urges that the criminal-trespass statute contains an exception for law-enforcement officers. TEX. PENAL CODE § 30.05(e)(3). However, that portion of section 30.05 was enacted during the 2009 legislative session, and it therefore cannot be asserted as a defense for events that occurred in 2008. Because of our disposition of appellant's first and second grounds, we need not address that issue, and we dismiss it as improvidently granted.

### Conclusion

We reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.

Delivered: November 21, 2012
Publish