

# NUMBER 13-13-00507-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

THE STATE OF TEXAS,                                                     Appellant,

v.

JOSE RUIZ,                                                               Appellee.

### On appeal from the 25th District Court
### of Gonzales County, Texas.

# O P I N I O N
**Before Chief Justice Valdez and Justices Benavides and Hinojosa
Opinion by Justice Benavides**

This cause is before this Court for a second time. *See State v. Ruiz*, 509 S.W.3d 451, 452 (Tex. App.—Corpus Christi 2015), *vacated and remanded by* PD-1362-15, 2017 WL430291, at *1 (Tex. Crim. App. Feb. 1, 2017) (per curiam) (not designated for publication).

In its per curiam opinion, the Texas Court of Criminal Appeals stated that while our 2015 decision remained pending on its docket, the high court decided two cases analyzing the issue of exigent circumstances in the context of suppressing blood evidence obtained pursuant to a warrantless draw. Thus, the court of criminal appeals vacated our previous opinion and remanded this case for further analysis in light of those two opinions. *See id.* at *1.

Following the court of criminal appeals' mandate, we issue this new opinion today by re-analyzing the State's appeal challenging the trial court's granting of appellee Jose Ruiz's motion to suppress. We affirm.

## I.    BACKGROUND[1]

At approximately midnight on September 9, 2012, Gonzales, Texas police officer Bethany McBride responded to an automobile collision between a Lincoln and a Pontiac at the intersection of 90A and Robertson. The driver of the Pontiac remained at the scene and advised Officer McBride that the driver of the Lincoln—later identified as Ruiz—had fled the scene of the crash and had run behind a car wash in the area. Other witnesses at the scene relayed the same information to Officer McBride.

Upon closer inspection of the Lincoln, Officer McBride observed several exploded Bud Light beer cans in the front seat and found insurance paperwork in Ruiz's name. Officer McBride also confirmed that the vehicle was registered to Ruiz. Once Officer McBride's backup officer[2] arrived at the scene, she advised the backup officer that Ruiz

---

[1] The Honorable Gregory T. Perkes, former Justice of this Court, participated in this Court's previous decision on this matter. However, because Justice Perkes's term of office expired on December 31, 2016, the Honorable Leticia Hinojosa has been substituted in his place.

[2] The backup officer's name is unclear from the record.

2

had fled behind the car wash on Apache Loop. Officer McBride also testified that at that point "we had county officers and my backup officer try to locate [Ruiz]." The officers eventually located Ruiz in "the exact location" that witnesses had described and carried him to a patrol unit.

Officer McBride testified that once Ruiz was located, "it took several officers to get [Ruiz] from the field to carry him to the patrol unit." Officer McBride described Ruiz as "unresponsive," that he "couldn't open his eyes" and "wouldn't respond" to the officers. She further recalled that Ruiz had a "strong odor of alcoholic beverage" emitting from his person and also had "no apparent injuries" to his body.

Emergency medical service (EMS) personnel arrived at the scene and performed several sternum rubs on Ruiz but found him to be unresponsive. At that point, EMS transported Ruiz to the hospital, where he remained unconscious throughout the night.

Officer McBride testified that after "a period of time" she traveled to the hospital in order to "make sure that he was cleared medically and to have blood drawn." She eventually placed Ruiz under arrest and then gathered and filled out paperwork to order hospital personnel to perform a blood draw. Once the blood was drawn, Officer McBride took custody of the blood sample and "put it in the icebox at the Gonzales Police Department to be sent to [the] lab." While already in custody, doctors at the hospital told Officer McBride that they wanted to keep Ruiz hospitalized overnight "due to his condition." Officer McBride testified that she had no concern that he would flee from the hospital or destroy any evidence.

3

On cross-examination, when asked by Ruiz's attorney whether it would have been reasonable to obtain a warrant to draw Ruiz's blood that night, Officer McBride said no. When asked why, Officer McBride responded: "that night two officers on, to take one off, no." Furthermore, she estimated that it would have taken "probably about two or three hours" to get a warrant that night. Additionally, Officer McBride stated that she based her decision to draw Ruiz's blood on section 724.012 of the transportation code.[3]

On re-direct, Officer McBride testified that her investigation of Ruiz's crash took "longer" than a general traffic stop. Furthermore, she testified that no procedures were in place at the time within the Gonzales Police Department to obtain search warrants for blood evidence. And lastly, Officer McBride stated that it would have been "difficult" to find a judge to sign a warrant that night, and if she would have found a judge, she would have had to drive to that judge's house to obtain the appropriate signature.

After the hearing, the trial court granted Ruiz's motion to suppress and issued the following relevant findings of fact and conclusions of law:

**Findings of Fact**

1.      [Ruiz] was involved in an accident late at night to early morning on September 9, 2013. Gonzales Police Department Sgt. Bethany McBride responded.

2.      [Ruiz] became unconscious and was carried and placed in McBride's patrol vehicle.

. . . .

---

[3] During questioning, Ruiz's counsel referred to section 724.012 of the "penal code." The penal code does not contain a section 724.012. However, in closing arguments, the State directed the trial court's attention to section 724.012 of the *transportation code* in support of its argument to perform a warrantless blood draw pursuant to the implied consent statutory scheme. *See* TEX. TRANSP. CODE ANN. § 724.012 (West, Westlaw through 2017 1st C.S.). We treat all references to chapter 724 of the penal code rather than the transportation code in this record as inadvertent errors.

4

4. Following [Ruiz's] arrest by McBride the attending physicians indicated they wanted to keep [Ruiz] overnight.

5. There was no concern that [Ruiz] would flee from the hospital.

6. A warrant could have been obtained within 2 to 3 hours.

. . . .

8. McBride performed a criminal history check on [Ruiz] and found four previous convictions for DWI. Relying on Texas [Transportation] Code 724.012 and 724.014 McBride ordered the blood draw from [Ruiz].[4]

9. [Ruiz] remained in custodial arrest during the time the blood was drawn.

10. The court finds Officer McBride's testimony to be credible in all respects.

## Conclusions of Law

1. The court takes judicial notice of all statutes promulgated under [the] Texas Transportation Code and in effect during all times relevant to this case.

2. The court finds that it is bound by *Missouri v. McNeely*, 133 S.Ct. 1552, 1558, 185 L. Ed. 2d 696 (2013).

3. [Ruiz] did not revoke his consent to a blood draw under section 724.011 of the Texas Transportation Code.

4. No exigent circumstances existed in this case.

5. Believing itself to be bound by *McNeely*, the court granted the motion to suppress.

---

[4] Similar to our note in footnote 3, it appears that the trial court inadvertently referred to sections 724.012 and 724.014 of the penal code in its findings rather than sections 724.012 and 724.014 of the transportation code.

6. If exigent circumstances existed the court believes *McNeely* would not apply and the motion to suppress would be denied.

This appeal followed.

## II. MOTION TO SUPPRESS

By its sole issue, the State contends that the trial court erred by granting Ruiz's motion to suppress because he impliedly consented to the blood draw, and even if he did not consent, there were sufficient exigent circumstances to justify the warrantless blood draw.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion, but review the trial court's application of law to facts de novo. *Id.* We will sustain the trial court's ruling if the record reasonably supports that ruling and is correct on any theory of law applicable to the case. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010).

### B. Discussion

In this case, the State stipulated that Ruiz's blood was drawn without a warrant. Therefore, the burden shifted to the State to establish that the search was reasonable. *See Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances. *Missouri v. McNeely*, 569 U.S. 141, 156 (2013).

To meet its burden that the warrantless search in this case was reasonable, the State asserts that Texas's implied consent law, *see* TEX. TRANSP. CODE ANN. §§ 724.011; 724.014 (West, Westlaw through 2017 1st C.S.), established Ruiz's consent to the blood

draw to satisfy an exception to the warrant requirement; and in the alternative, exigent circumstances existed to justify the taking of Ruiz's blood. We will analyze each argument below.

### 1. Implied Consent

Section 724.011(a) of the transportation code implies consent for an individual who has been arrested for driving while intoxicated. *See id.* § 724.011. This implied consent, however, may be revoked, absent certain exceptions. *See id.* § 724.013 ("Except as provided by Section 724.012(b), a specimen may not be taken if a person refuses to submit to the taking of a specimen designated by a peace officer."). Stated another way, if a drunk-driving suspect refuses to submit to the taking of a specimen, police are prohibited from doing so without a warrant. *See id.* However, if a drunk-driving suspect is "dead, unconscious, or otherwise incapable of refusal," implied consent is considered "not to have [been withdrawn] as provided by section 724.011." *See id.* § 724.014(a). This implied-consent-law framework "does not give officers the ability to forcibly obtain blood samples from anyone arrested for [driving while intoxicated]," but instead "gives officers the ability to present an affidavit to a magistrate in every DWI case, just like every other criminal offense." *See Beeman v. State*, 86 S.W.3d 613, 616 (Tex. Crim. App. 2002).

In this case, the State relies upon these implied-consent statutes to establish that Ruiz effectively consented to the warrantless blood draw, which is a recognized exception to the warrant requirement. We disagree with the State's position. The record is undisputed that Ruiz was unconscious and hospitalized during the course of Officer McBride's investigation on September 9, 2012. Regardless of this clear fact, the State appears to rely upon section 724.014(a) as a key to unlock the recognized consent

exception to the warrant requirement. We do not read the implied consent statutes as expansively as the State advances on appeal.

When the State seeks to rely upon consent to justify the lawfulness of a search, it must prove that the consent was, in fact, freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 546 (1968). Additionally, a person who consents to a search may also specifically limit or revoke such consent. *See Miller v. State*, 393 S.W.3d 255, 266 (Tex. Crim. App. 2012); *Valtierra*, 310 S.W.3d at 450. The question of whether consent was valid is a question of fact that the State must prove by clear and convincing evidence. *Fienen v. State*, 390 S.W.3d 328, 333 (Tex. Crim. App. 2012). The fact finder must consider the totality of the circumstances in determining whether consent was given voluntarily. *Id.* Thus, the State cannot meet its burden to establish that one consented if such consent was not given freely and voluntarily. *See Bumper*, 391 U.S. at 546.

Here, the trial court found that Ruiz was unconscious and did not respond to Officer McBride. It is clear that based upon these facts, Ruiz was unable to give his consent freely and voluntarily, or have the opportunity to revoke such consent. *See id.*; *see also Florida v. Jimeno,* 500 U.S. 248, 252 (1991) (holding that a suspect may delimit the scope of a search for which he has consented); *Miller v. State*, 393 S.W.3d 255, 266 (Tex. Crim. App. 2012) ("[I]t is undisputed that . . . consent may be limited or revoked.").

Therefore, we hold that sections 724.011(a) and 724.014(a) of the transportation code is not the equivalent to voluntary consent as a recognized exception to the warrant requirement. *See Forsyth v. State*, 438 S.W.3d 216, 222 (Tex. App.—Eastland 2014, pet. ref'd) (holding that implied consent under the Transportation Code is not the equivalent to voluntary consent as a recognized exception to the warrant requirement).

In summary, we conclude that the State did not meet its burden to establish the reasonableness of drawing Ruiz's blood without a warrant pursuant to sections 724.011(a) and 724.014(a) of the transportation code.[5]  *See Ford*, 158 S.W.3d at 492.  Therefore, we turn now to the State's alternative argument that exigent circumstances justified Ruiz's warrantless blood draw.

### 2.  Exigency

Exigency is a "well-recognized exception" to the warrant requirement, when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment."  *Kentucky v. King*, 131 S.Ct. 1849, 1856 (2011) (internal quotation marks and brackets omitted).  Exigent circumstances that have been recognized by the United States Supreme Court include:  entering a home to provide emergency assistance to an occupant; engaging in a hot pursuit of a fleeing suspect, entering a burning building to put out a fire and investigate its cause, and preventing the imminent destruction of evidence.  *See McNeely*, 569 U.S. at 149 (internal citations omitted).

To validate a warrantless search based on exigent circumstances, the State must satisfy a two-step process.  *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007).  First, probable cause must exist to search—that is, reasonable, trustworthy facts and circumstances within the knowledge of the officer on the scene [that] would lead an officer of reasonable prudence to believe that the instrumentality . . . or evidence of a crime will be found."  *See id.* at 685.  Second, an exigent circumstance exists to justify a

---

[5] We do not hold that sections 724.011(a) and 724.014(a) of the transportation code are unconstitutional.  Instead, we hold that these provisions do not create per se exceptions to the Fourth Amendment's warrant requirement.

warrantless search. *See id.* To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, we look to the totality of circumstances. *McNeely*, 569 U.S. at 149. Without establishing probable cause and exigent circumstances, a warrantless search will not stand. *Gutierrez*, 221 S.W.3d at 685–86.

### a. Probable Cause to Search?

In this case, we agree with the State that it had probable cause to arrest Ruiz for driving while intoxicated. The record shows that Ruiz was involved in an accident, in which he fled the scene. Upon arrival, Officer McBride discovered several beer cans thrown about Ruiz's vehicle. Furthermore, Ruiz's unconscious body was found in a field behind a car wash, and according to Officer McBride, Ruiz "couldn't open his eyes" and his body emitted a "strong odor of [alcohol]." We conclude that sufficient probable cause existed to arrest Ruiz for driving while intoxicated. *See id.* at 685.

### b. Existence of Exigent Circumstances?

With regard to the second step—that is, existence of exigent circumstance—we examine two recent cases from the Texas Court of Criminal Appeals for guidance, *Cole v. State* and *Weems v. State*. *See* 490 S.W.3d 918 (Tex. Crim. App. 2016); 493 S.W.3d 574 (Tex. Crim. App. 2016); *see also Ruiz,* 2017 WL 430291 at *1 ("[W]e . . . remand this case to that court for it to consider whether, under the totality of the circumstances known to the police officer at the time, exigent circumstances existed in light of this Court's intervening decisions in *Cole* and *Weems.*").

### 1. Examination of *Cole v. State*

In *Cole*, the court of criminal appeals concluded that exigent circumstances justified a warrantless blood draw. *See* 490 S.W.3d at 927.

In that case, the record showed that Cole drove his large pickup at 10:30 p.m. in excess of 110 miles per hour through the streets of Longview, Texas, ran a red light at a busy intersection, and struck a pickup that caused an explosion, engulfing the other driver's pickup and killing the other driver instantly. *See id.* at 920. The initial responding police officer arrived to a fiery scene, not knowing who was dead or alive. *See id.* Other officers later arrived and assisted in removing Cole from his "heavily damaged truck's driver's seat." *Id.* Even at that time of night, "there was still considerable activity and traffic in the area of the accident," which required "as many officers on the scene as they could possibly get" to maintain public safety. *Id.* Fire and explosions from the pickup continued to rage as the officers blocked off several major intersections in the area in order to protect the public. *Id.* In addition to the ongoing public safety situation, the crash occurred during a shift change at the police department, which "complicated satisfying the manpower needed to secure the scene, conduct an investigation, and maintain public safety." *Id.*

Upon making contact with Cole near the scene of the crash, he appeared "confused and did not know where he was." EMS evaluated Cole's injuries and Cole admitted to EMS that he had taken "some meth." *Id.* Once at the hospital, police described Cole's behavior as "'tweaking'—a condition consistent with methamphetamine intoxication." *Id.*

The police officer tasked with investigating whether a crime was committed in this case was called back to the scene of the crash after his shift had ended for the day. *Id.* During his investigation, which lasted approximately three hours, the officer "discovered a large debris field that spread beyond the intersection and nearly a full block long." *Id.* The officer testified that fourteen officers assisted with the scene of the crash that night

11

performing law enforcement or public safety-duties. *Id.* The scene was not cleaned up and cleared until 6 a.m. the following morning. *Id.*

Back at the hospital, police arrested Cole and attempted to obtain a blood sample from him by seeking his voluntary consent after reading him the statutory warning. *Id.* at 920–21. During the reading of the warnings, Cole "frequently interrupted" the officer and insisted that he used methamphetamines "and was not drunk." *Id.* at 921. Cole refused to provide a blood sample, and the officer requested hospital staff to draw Cole's blood. *Id.* The evidence revealed that Cole's blood "contained intoxicating levels of amphetamine and methamphetamine." *Id.*

Cole moved to suppress the blood evidence. The lead accident investigator testified that before he arrived and conducted his investigation, "there was no one else who could have determined the nature and cause of the accident or who was at fault." *Id.* at 921. The investigator further testified that he did not try to get a warrant with an on-call judge because he was unable to leave the scene to go to the courthouse and speak to a prosecutor to secure a warrant. *Id.* In the investigator's estimation, the warrant-process "takes an hour to an hour-and-a-half 'at best'" and it was not feasible to wait until the accident investigation was entirely complete before securing a warrant. *Id.* Furthermore, the investigator "expressed concern that medical intervention and treatment—specifically the administration of medicine and especially narcotic medicines—could affect the integrity of a blood sample." *Id.* Lastly, the investigator testified that to assign another officer at the scene the responsibility to obtain a warrant "would leave an essential duty unfulfilled." *Id.* The trial court denied Cole's motion to suppress after concluding that exigent circumstances justified the warrantless seizure. *Id.* The Texarkana Court of Appeals

reversed the trial court and concluded that exigent circumstances did not exist in that case. *See Cole v. State*, 454 S.W.3d 89, 93–104 (Tex. App.—Texarkana 2014)*, rev'd and remanded by Cole*, 490 S.W.3d at 927.

In reversing the court of appeals and upholding the trial court's ruling denying the motion to suppress, the Texas Court of Criminal Appeals took into account several factors to justify the warrantless blood draw. As a starting point, it cautioned other courts from examining a record through the lens of hindsight because doing so "distorts a proper exigency analysis's focus"—that is, whether officers had a reasonable belief that obtaining a warrant was impractical based on the circumstances and information known at the time of the search. *Id.* at 925.

Next, the *Cole* Court concluded that based on the facts of the case, the time required to complete the accident investigation and the lack of available law enforcement personnel further hindered the pursuit of a warrant. *Id.* Additionally, the court concluded that the officer at the hospital could not draw up warrant paperwork because she was responsible for Cole's custody at the hospital. *Id.* The court also noted that a number of other officers on duty were performing necessary responsibilities that night "including securing the accident scene, directing traffic, and keeping the public away from the scene." *Id.* Of the fourteen officers working the scene of the crash, all of them were performing "important law enforcement or public safety duties" and taking any of them away from those duties to draw up a warrant "would have left a necessary duty unfilled." *Id.* at 926. Moreover, the court of criminal appeals concluded that even if an attempt was made to secure a warrant, it would have taken between an hour and an hour-and-a-half, which reasonably concerned the lead accident investigator because of the potential medical

13

intervention performed at the hospital and the natural dissipation of methamphetamine in Cole's body would affect the reliability of the sample. *Id.* Furthermore, the lead investigator was also reasonably concerned that hospital personnel would administer pain medication, including narcotics, which would also affect the blood sample's integrity. *Id.* Lastly, unlike *McNeely*, which held that a minimally delayed test when dealing with an alcohol-related offense does not drain the test of reliability because experts can work backwards to calculate blood-alcohol content at an earlier date, this case dealt exclusively with methamphetamine intoxication, which has no known elimination rate like alcohol. *Id.* at 926–27. As a result, the police faced inevitable evidence destruction without the ability to know how much evidence it was losing as time passed. *Id.* at 927.

Based on a review of the totality of the circumstances, the court of criminal appeals held that obtaining a warrant was impractical in this case because police were confronted with the natural destruction of evidence through natural dissipation of intoxicating substances, coupled with logistical and practical constraints posed by a severe accident involving death and the attendant duties that the accident demanded. *Id.* at 927.

### 2. Examination of *Weems v. State*

In *Weems*, the court of criminal appeals concluded that the state failed to establish that a warrantless blood draw was justified by exigent circumstances. 493 S.W.3d 574, 582 (Tex. Crim. App. 2016).

In that case, the record showed that after drinking at a bar, Weems drove himself and a friend back to his house, when Weems's car "started to slowly veer off the road, flipped over on to its roof, and struck a utility pole." *Id.* at 575. A passerby stopped to observe Weems's vehicle on its roof with the tires still spinning. *Id.* Weems exited the

vehicle through the driver's side window, tried to stand but stumbled, and experienced difficulty maintaining his balance. *Id.* When asked if he was okay or drunk, Weems responded that he was drunk, then ran from the scene. *Id.* A Bexar County sheriff's deputy responded to the scene, and as he approached, a passerby waved down his patrol unit. *Id.* at 576. The passerby pointed to a parked car near the area and told the deputy that "someone was under her car and that he did not belong there." *Id.* The deputy observed a man—later identified as Weems—under the car, which had matched the description of the subject involved in the accident. *Id.* The deputy noted that Weems had bloodshot eyes, slurred speech, a bloodied face, and an inability to stand on his own. *Id.* Deputies eventually arrested Weems for suspicion of driving while intoxicated. *Id.*

Weems refused consent to give a breath or blood sample after being read the statutory warnings about the consequences of refusal. *Id.* Weems was treated at the scene by EMS, but because he complained about neck and back pain, EMS transported him to the hospital, which was "only 'a couple of minutes'" away from the accident scene. *Id.* At the hospital, Weems was placed in the hospital's trauma unit. *Id.* The deputy investigating the accident arrived at the hospital, filled out a form requesting a blood draw, and gave it to the nurse in charge. *Id.* The hospital was "particularly busy that night" so Weem's blood was drawn at 2:30 a.m., over two hours after his arrest. *Id.* The testing revealed that Weems's blood-alcohol concentration was .18 grams per deciliter, well above the .08 gram per deciliter definition of intoxication. *Id.*

The trial court denied Weems's motion, and a jury convicted him of felony DWI. The San Antonio Court of Appeals reversed and held *inter alia* that the record developed at trial did not support admitting the blood evidence under the exigency exception. *See Weems v. State*, 434 S.W.3d 655, 665–66 (Tex. App.—San Antonio 2014).

In affirming the intermediate appellate court, the court of criminal appeals began its analysis by noting the circumstances relevant to an exigency analysis of a warrantless blood draw include: the natural dissipation of alcohol, procedures in place for obtaining a warrant, the availability of a magistrate judge, and the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence. *Weems*, 493 S.W.3d at 580. Relevant to the case, the court of criminal appeals highlighted that the sheriff's deputy acknowledged that due to the day of the week of the accident, the substantial delay in obtaining Weems's blood "was at least foreseeable." *Id.* at 581. The *Weems* Court further noted that the record was devoid of what procedures were in place, if at all, for obtaining a warrant when the arrestee is taken to the hospital, or whether Bustamante could have reasonably obtained a warrant, and if so, how long that process would have taken. *Id.* Furthermore, the deputy's testimony indicated that a magistrate was normally on duty to review search-warrant requests from the sheriff's office. *Id.* at 581–82. Moreover, the court of criminal appeals pointed out that the hospital's close proximity to the scene of the accident did not necessarily make obtaining a warrant impractical or unduly delay the taking of Weems's blood to the extent that natural dissipation would significantly undermine a blood test's efficacy. *Id.* at 582. Lastly, the record showed that another deputy accompanied the arresting officers to the hospital and waited until Weems's blood was taken. *See id.*

Based on a review of the totality of circumstances, the court of criminal appeals held that the State was unable to demonstrate that practical problems existed in obtaining a warrant within a timeframe that still preserved the opportunity to obtain reliable evidence. *Id.* at 582.

### 3. Application of *Cole* and *Weems*

On review of the totality of the circumstances found in the record of this case, we conclude that Ruiz's warrantless blood draw was not justified by exigent circumstances. To be sure, certain facts in this record, as we will discuss in further detail below, tend to gravitate toward a finding of exigency. However, the totality of the circumstances found in the record do not warrant such a finding.

We begin by reemphasizing that exigency analyses are fact-intensive and require case-by-case determinations based on the totality of circumstances. *See Cole*, 490 S.W.3d at 923 (citing *McNeely*, 569 U.S. at 149). The record in this case is not as robust as those in *Cole* and *Weems*. Both *Cole* and *Weems* were post-trial direct appeals, in which a seemingly more complete record was developed for review. The present case is before us on a pre-trial State's appeal, with a factual record consisting of one twenty-four-page hearing transcript containing only arguments by counsel and testimony from one witness, Officer McBride. With that in mind, we turn to the facts of this case.

The record undisputedly shows that Ruiz was involved in a car crash, fled the scene, and ended up unconscious in a nearby field. Ruiz remained unconscious for the remainder of the night. Further, Ruiz's level of unconsciousness was so severe that he had to be carried by "several officers" from the field where he was found to one of the officer's patrol units. EMS personnel unsuccessfully attempted several times to wake him

17

by performing sternum rubs. Moreover, once at the hospital, physicians wanted to keep Ruiz hospitalized overnight "due to his condition." Officer McBride testified that she had no concern that Ruiz would flee from custody that night and "didn't think [Ruiz] was going anywhere."

Next, the record shows that no procedures were in place for Gonzales police to obtain search warrants for blood from drunk-driving suspects at the time of this accident. Despite the lack of procedures in place, Officer McBride agreed that it would "have been difficult to find a judge" to sign a warrant at that time of day on an early Sunday morning, but even if she had found a judge, she would have had to drive the warrant to the judge's house. According to Officer McBride, she estimated that it would have taken "two or three hours" to obtain a warrant that night. Officer McBride further testified that it would have been unreasonable that night to obtain a warrant—even if it took two hours to complete— because "Being that, that night two officers on, to take one off, no."[6] Without further elaboration from Officer McBride, however, this testimony seems to suggest that Officer McBride did not want to remove an officer, including herself, away from regular police duties in order to prepare a warrant.

These facts draw some similarities and differences to the facts involved in *Cole*. In *Cole*, fourteen officers were on duty who were performing "important law enforcement or public-safety duties" related to the serious and explosive automobile accident involving a death in a busy city street intersection. 490 S.W.3d at 926. The lead accident investigator in *Cole* testified that taking any one of the fourteen officers away "would have left a necessary duty unfulfilled." *Id.* Additionally, the lead investigator testified that even if they

_____

[6] Officer McBride also testified that unidentified "county officers" assisted in locating Ruiz at the scene of the crash.

18

would have applied for a warrant, it would have taken "an hour to an hour and a half" to obtain. *Id.* The timing of applying for the warrant concerned the lead investigator in *Cole* because he was reasonably concerned that "the administration of pain medication, specifically narcotics, would affect the blood sample's integrity." *Id.*

Turning back to the record of this case, Officer McBride testified in a conclusory manner that taking one officer off regular duty to apply for a warrant would have been unreasonable. We conclude that this testimony, without more, is insufficient to support a finding of exigency because it is readily distinguishable from the facts in *Cole.* The *Cole* record showed that every available officer was fulfilling a necessary duty related to a serious car crash that caused a fire, explosions, and a death. Additionally, the crash scene in *Cole* was an active scene from approximately 10:30 p.m. until 6 a.m. the following morning. *See id.* at 920. Nothing in the record here shows that the available officers on duty that night in Gonzales were fulfilling the type of law enforcement or public safety duties of the tremendous magnitude that existed in *Cole* nor was there any articulated concern that Ruiz's blood sample would be affected as a result of the two to three-hour window it would have taken the officer to apply for and obtain a search warrant.

We emphasize that our analysis today on officer availability does not foreclose the possibility in future cases of finding exigent circumstances in some other situations when an available police officer might be fulfilling a law enforcement or public safety duty that does not rise to the level exhibited in *Cole.* However, based on the totality of circumstances in this case, we conclude that the State failed to establish exigency. Furthermore, we weigh these facts against a finding of exigency by focusing our analysis on whether officers had a reasonable belief that obtaining a warrant was impractical based

19

on the circumstances and information known at the time of the search rather than through the distorted lenses of hindsight. *See Cole*, 490 S.W.3d at 925; *see also Weems*, 493 S.W.3d at 582 ("Another officers' presence or the 'hypothetically available officer' that, in theory, could have secured a warrant in the arresting officer's stead will certainly not render all warrantless blood draws a Fourth Amendment violation, nor do we suggest it is a circumstance that the State must disprove in every case to justify a warrantless search under an exigency theory.").

Next, the record shows that Officer McBride was without any procedures in place to guide her in obtaining a search warrant in this type of case. Additionally, the trial court found Officer McBride's testimony credible that she believed that it would have been "difficult" to find a judge at that time of night. These facts viewed in isolation certainly lend themselves to finding exigency. However, the trial court also found that Officer McBride erroneously relied upon the implied consent statutes of the transportation code in ordering the hospital staff to draw Ruiz's blood. Stated another way, the trial court could have reasonably found that despite finding Officer McBride's testimony credible regarding the reduced likelihood of finding a judge at that hour and the lack of procedural guidelines in place at the time, Officer McBride erroneously believed that she did not need to apply for a warrant based upon the implied consent statutes.

Lastly, as noted above, Officer McBride testified that she had no concern about Ruiz destroying any evidence in her investigation other than the alcohol metabolizing in his blood. In *Cole*, however, the court of criminal appeals found exigent circumstances after pointing out that officers were concerned about the timing of obtaining Cole's blood quickly to the administration of pain medication affecting Cole's blood sample's integrity,

20

as well as not knowing the elimination rate of methamphetamine in the blood. 490 S.W.3d at 926. Here, the State was dealing with an alcohol-related offense rather than one involving methamphetamines. As the *McNeely* Court stated, blood alcohol content evidence is "lost gradually and relatively predictably" which permits experts to work backwards from the blood alcohol content at the time the sample was taken to determine the blood alcohol content at the time of the alleged offense. *See McNeely*, 569 U.S. at 155–56 (holding that longer intervals may raise questions about the accuracy of the blood alcohol content calculation, which may create exigent circumstances justifying a warrantless blood sample). On this record, aside from Officer McBride's testimony that alcohol dissipates over time, no other evidence was presented by the State regarding the reliability, destruction, or possible tainting of Ruiz's blood alcohol-evidence.

In summary, the Fourth Amendment mandates that police in drunk-driving investigations obtain a warrant before a blood sample can be drawn, so long as it does not significantly undermine the efficacy of the search. *Id.* at 152. The burden to prove the necessity of a warrantless draw rests solely with the State. *See Ford*, 158 S.W.3d at 492. Based on the particulars of this record and considering the totality of the circumstances, the State has failed to demonstrate that exigent circumstances existed to satisfy the Fourth Amendment's reasonableness standard. *See id.*; *see also Weems*, 493 S.W.3d at 582 (holding that the State failed to carry its burden to establish exigency in a warrantless blood draw).

###### III.    CONCLUSION

We affirm the trial court's order.[7]

GINA M. BENAVIDES,
Justice

Publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
11th day of January, 2018.

---

[7] On February 23, 2017, Ruiz's original appellate attorney, the Honorable Mark Symms, filed a motion to withdraw as counsel in this case. This Court then abated this proceeding and remanded the matter to the trial court for its consideration and possible action of appointing new counsel. On March 1, 2017, the trial court appointed the Honorable Chris Illes to serve as Ruiz's new appellate attorney. To the extent that the Honorable Mark Symms's motion remains pending in this Court, it is hereby granted.