**Opinion issued October 15, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00234-CR

———————————

**FRANK ENNS, JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 506th District Court**
**Waller County, Texas**
**Trial Court Case No. 17-02-15918**

---

## CONCURRING OPINION

Frank Enns, Jr. contends that the trial court erred in denying his motion to suppress the evidence against him and refusing to instruct the jury on his necessity defense. The majority rejects both contentions and affirms Enns's judgment of conviction for possession with intent to deliver methamphetamine.

I agree that the trial court did not err in denying Enns's motion to suppress or refusing to instruct the jury on his necessity defense. Thus, I concur in the judgment to affirm. But I take exception to the majority's suppression analysis.

With respect to the motion to suppress, the trial court concluded that peace officers had reasonable suspicion to conduct a traffic stop and detain Enns:

(1) based on surveillance indicating that he was transporting drugs, and

(2) because he arguably committed a traffic offense, specifically, driving on the improved shoulder of the highway.

The majority sustains the trial court's suppression ruling on both grounds.

The majority is right that officers had reasonable suspicion to stop Enns based on their surveillance. But the record refutes the notion that Enns arguably committed a traffic offense, and the majority's contrary holding will subject law-abiding citizens to unreasonable traffic stops. I thus decline to join this part of its opinion.

**BACKGROUND**

Two witnesses testified at the suppression hearing: B. Mace and R. Garrett, a peace officer and lieutenant, respectively, with the Waller County Sheriff's Department. Mace is the officer who made the traffic stop.

Mace testified that Garrett told him a White Ford Crown Victoria with tinted windows was transporting narcotics through the county. Garrett let Mace know when to expect the vehicle and its general direction of travel.

When the Crown Victoria drove past Mace's location, Mace followed in his patrol car. He drove faster than the Crown Victoria to catch up. Mace said he was driving somewhere between 65 and 75 miles per hour and that he was exceeding the posted speed limit by 5 to 10 miles per hour. The pursuit took place on Farm to Market Road 359, a two-lane state highway with paved improved shoulders.

Once Mace caught up to the Crown Victoria, its driver, Enns, immediately moved onto the highway's improved shoulder. Mace was between 10 to 15 car lengths behind the Crown Victoria when Enns did so.

Mace testified that it was not necessary for Enns to pull onto the shoulder because Mace did not signal that he was going to pass by turning on his patrol car's blinkers or tailgating the Crown Victoria. Nor did Mace signal an intent to pass by moving his patrol car to the left of the Crown Victoria. Mace testified that he never intended to pass. But he conceded that had he not taken his foot off the accelerator, he would have done so.

Mace also testified that it was unsafe to drive on the improved shoulder. He explained that "if a car would have pulled out of a driveway or side street," being on the shoulder could have caused an accident. But Mace conceded that he did not see any cars that were trying to pull out.

Mace activated his patrol car's lights immediately after Enns drove the Crown Victoria onto the improved shoulder. Mace testified that when he stopped the Crown

3

Victoria, he already suspected it was the vehicle Lieutenant Garrett told him to be on the look-out for—the one transporting narcotics.

The State introduced a video of the pursuit recorded by the patrol car's dash-camera. Mace agreed that the video was accurate. The video shows that Mace drove for a little over half a minute before the Crown Victoria came into view in the distance. In the next half a minute or so, Mace closed within several car lengths of the Crown Victoria, at which point its driver moved the vehicle onto the improved shoulder. While the Crown Victoria was on the improved shoulder, the vehicle did not pass any driveways or side streets. Mace initiated a traffic stop shortly after the Crown Victoria moved onto the improved shoulder.

## APPLICABLE LAW

### Reasonable Suspicion

To conduct a traffic stop consistent with the Fourth Amendment, a peace officer must have reasonable suspicion. *Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012). An officer has reasonable suspicion if he is aware of specific articulable facts that, combined with rational inferences from those facts, would lead him to suspect that a particular person has committed, is committing, or soon will commit a crime. *Id.* The officer who makes the stop need not be aware of every fact that supports reasonable suspicion; the cumulative information collectively known

4

by cooperating law enforcement officers may establish reasonable suspicion. *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011).

The State bears the burden to prove that a peace officer had reasonable suspicion to make a warrantless traffic stop. *Arguellez v. State*, 409 S.W.3d 657, 663 (Tex. Crim. App. 2013). Reasonable suspicion is not a stringent standard; it requires only some minimal level of objective justification for the stop. *Brodnex v. State*, 485 S.W.3d 432, 437 (Tex. Crim. App. 2016). This standard is less demanding than probable cause and requires a showing considerably less than a preponderance of the evidence. *Furr v. State*, 499 S.W.3d 872, 878 (Tex. Crim. App. 2016). But an officer's inarticulate hunch, intuition, or mere good-faith surmise do not constitute reasonable suspicion. *Brodnex*, 485 S.W.3d at 437. Nor does an officer's conclusory opinion that a person's conduct was criminal or violated the law. *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). In addition, an officer's mistake about the legal significance of articulable facts cannot support a finding of reasonable suspicion. *Abney v. State*, 394 S.W.3d 542, 550 (Tex. Crim. App. 2013).

Whether a peace officer had reasonable suspicion to make a traffic stop is a wholly objective inquiry. *Hamal*, 390 S.W.3d at 306. There must be an objective basis for the stop; the officer's subjective intent or motive is irrelevant. *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001). The question is whether a reasonable officer in the same situation would believe that criminal activity was

5

afoot based on the facts and circumstances actually known to him at the time of the stop. *State v. Duran*, 396 S.W.3d 563, 569, 572 (Tex. Crim. App. 2013). The possibility of innocent activity need not be ruled out for reasonable suspicion to exist. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 36 (Tex. Crim. App. 2017). Reasonable suspicion may exist even when conduct is as consistent with innocent activity as criminality. *York v. State*, 342 S.W.3d 528, 536 (Tex. Crim. App. 2011). The issue is not whether the law was violated but whether a reasonable officer could have believed the law was violated. *Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2015).

In assessing whether there is an objective basis for a traffic stop, we consider the totality of the circumstances. *Garcia*, 43 S.W.3d at 530. While individual circumstances may seem innocent in isolation, in combination they may reasonably suggest criminality. *Wade v. State*, 422 S.W.3d 661, 668 (Tex. Crim. App. 2013). Thus, we must consider all the facts together when assessing whether reasonable suspicion exists. *Loesch v. State*, 958 S.W.2d 830, 832 (Tex. Crim. App. 1997). We do not, however, consider information an officer gained after the traffic stop, because the stop is either good or bad the moment it starts. *Duran*, 396 S.W.3d at 569–70. Reasonable suspicion cannot be based on post-hoc rationalizations. *Id.*

We apply a bifurcated standard of review to the totality of the circumstances. *Abney*, 394 S.W.3d at 547. First, we almost totally defer to the trial court's

determination of the historical facts that the record supports. *Id.* But our deference is not absolute; we review indisputable visual evidence contained in a video or other recording de novo. *Miller v. State*, 393 S.W.3d 255, 263 (Tex. Crim. App. 2012); *Duran*, 396 S.W.3d at 570; *Carmouche v. State*, 10 S.W.3d 323, 331–32 (Tex. Crim. App. 2000). Second, we also review de novo the trial court's application of the law to the facts, so long as its application of the law does not turn on credibility or demeanor. *Abney*, 394 S.W.3d at 547. A question turns on credibility or demeanor when the testimony of one or more witnesses, if believed, is always enough to add up to what is needed to satisfy the substantive issue. *Id.*

If the trial court makes findings of fact, we determine whether the evidence supports those findings when viewed in the light most favorable to its ruling. *Id.* at 548. If the trial does not make findings of fact, we review the evidence in the light most favorable to its ruling and assume the trial court made implicit findings supported by the record. *Ford*, 158 S.W.3d at 493. The ultimate question of whether a given set of facts gives rise to reasonable suspicion for a traffic stop is a question of law that the appellate court must decide. *Garcia*, 43 S.W.3d at 531.

**Driving on an Improved Shoulder**

The Transportation Code provides:

> An operator may drive on an improved shoulder to the right of the main traveled portion of the highway if that operation is necessary and may be done safely, but only:
>
> (1) to stop, stand, or park;
>
> (2) to accelerate before entering the main traveled lane of traffic;
>
> (3) to decelerate before making a right turn;
>
> (4) to pass another vehicle that is slowing or stopped on the main traveled portion of the highway, disabled, or preparing to make a left turn;
>
> (5) to allow another vehicle traveling faster to pass;
>
> (6) as permitted or required by an official traffic-control device; or
>
> (7) to avoid a collision.

TEX. TRANSP. CODE § 545.058(a).

Under section 545.058(a), necessity is not a freestanding requirement; the Court of Criminal Appeals has held that an operator may legally drive on an improved shoulder whenever doing so is a necessary part of achieving one of the seven approved purposes and doing so can be done safely. *Lothrop v. State*, 372 S.W.3d 187, 191 (Tex. Crim. App. 2012). Driving on an improved shoulder—in and of itself—is not prima facie evidence of a traffic offense. *Id.* Thus, if a peace officer witnesses an operator driving on an improved shoulder, and it appears that doing so

is necessary to achieve one of the seven approved purposes, and it is done safely, the officer does not have reasonable suspicion that the operator is committing an offense. *Id.*; *accord State v. Cortez*, 543 S.W.3d 198, 205 (Tex. Crim. App. 2018) (peace officer has reasonable suspicion to stop operator for driving on improved shoulder if it appears that doing so is not necessary to achieve one of seven approved purposes or driving on improved shoulder cannot be done safely). Driving on an improved shoulder, standing alone, is not a legally valid basis for a traffic stop. *Tex. Dep't of Pub. Safety v. Taunton*, No. 01-18-00565-CV, 2019 WL 3819540, at *3 (Tex. App.—Houston [1st Dist.] Aug. 15, 2019, no pet.) (mem. op.).

## ANALYSIS

### No Reasonable Suspicion of a Traffic Offense

The dispositive evidence is undisputed and indisputable. Mace testified that he exceeded the speed limit by 5 to 10 miles per hour to catch up to Enns. When Mace caught up, he was driving faster than Enns. Mace said so at the suppression hearing, and the video recorded by his patrol car's dash-camera confirms the accuracy of this testimony. Mace agreed that his speed as he approached Enns was sufficient to pass him. Under Texas law, an operator may drive on an improved shoulder "to allow another vehicle traveling faster to pass." TRANSP. § 545.058(a)(5). Thus, Enns was legally entitled to move onto the shoulder.

Mace said he never intended to pass. This is doubtless true, as Mace suspected Enns was transporting narcotics. But Mace's subjective intent—which Enns could not have known—is irrelevant to the existence of reasonable suspicion, which turns on objective facts, not subjective intent. *See Garcia*, 43 S.W.3d at 530.

Mace also said he did not signal an intent to pass by activating his car's blinkers, tailgating Enns, or positioning his patrol car to Enns's left. But none of these actions is required for an operator like Enns to lawfully move onto the shoulder. The statute allows an operator to do so "to allow another vehicle traveling faster to pass." TRANSP. § 545.058(a)(5). A faster travelling vehicle is the sole criterion imposed by this section. The statute does not require an operator to witness some additional manifestation of the other operator's intent to pass before driving on the shoulder becomes lawful. *Id.* Indeed, under the statute, whether the other operator desires or actually tries to pass is irrelevant to the lawfulness of driving on the shoulder. The statute makes it lawful for one operator to drive on the shoulder to give another an opportunity to pass. *See id.*; *see also* NEW OXFORD AMERICAN DICTIONARY 44 (3d ed. 2010) (defining "allow" as "give the necessary time or opportunity for").

Thus, to the extent Mace thought Enns violated the law by driving on the shoulder because Mace did not signal an intent to pass by taking some action in addition to traveling faster, Mace was mistaken about the legal significance of his

failure to take such action. His mistake about the legal significance of his inaction cannot support a finding of reasonable suspicion. *See Abney*, 394 S.W.3d at 550.

Mace also said it was unsafe for Enns to drive on the shoulder of the road because doing so could have caused an accident if other vehicles had emerged from driveways or side streets. But Mace's dash-camera video shows that Enns did not pass any driveways or side streets while driving on the shoulder. Because this indisputable visual evidence refutes Mace's testimony, Mace's testimony that driving on the shoulder posed a risk of accident is no evidence. *See Cortez*, 543 S.W.3d at 205 (dash-cam dispelled officer's contrary testimony); *Carmouche*, 10 S.W.3d at 332 (declining to credit trial court's implicit finding because video provided indisputable visual evidence contradicting officer's testimony).

In sum, Mace did not have an objectively reasonable basis for stopping Enns based on a traffic violation. The record permits no other conclusion.

### The Majority's Contrary Holding is Lawless

The majority holds that Enns arguably committed a traffic violation based on Mace's testimony that he "gave no indication that he was going to pass" Enns and that Enns therefore "crossed onto the shoulder without apparent cause or reason in violation of the Transportation Code." The majority, however, relegates the relevant provision of the Transportation Code—section 545.058(a)(5)—to a footnote. The majority does not explain how an officer in the same circumstances could reasonably

11

suspect Enns had violated section 545.058(a)(5) consistent with the Court of Criminal Appeals' binding interpretation of this provision in *Lothrop*, which the majority ignores.

The Transportation Code makes it lawful for an operator to drive on an improved shoulder if it is necessary "to allow another vehicle traveling faster to pass" and it "may be done safely." TRANSP. § 545.058(a)(5). The majority's holding cannot be reconciled with this language. The statute gives an operator the discretion to move onto the shoulder whenever he encounters a faster traveling vehicle, provided he can do so safely. *See id.*; *Lothrop*, 372 S.W.3d at 191. The statute does not impose any other requirement for moving onto the shoulder. Enns therefore did not arguably violate the Transportation Code by doing so. The legislature explicitly made Enns's behavior legal, and it "would violate legislative intent to allow that behavior to serve as the basis of a traffic stop." *Lothrop*, 372 S.W.3d at 191.

In relying on Mace's failure to signal an intent to pass by activating his car's blinkers, tailgating Enns, or positioning his patrol car to Enns's left, the majority effectively rewrites section 545.058(a)(5) to require something it does not—a manifestation of the other operator's desire to pass. In doing so, the majority violates ordinary principles of statutory interpretation. When, as here, a statute is unambiguous, we must enforce it as written; we cannot add to or subtract from its plain language. *O'Brien v. State*, 544 S.W.3d 376, 384 (Tex. Crim. App. 2018).

12

Nor is the majority entitled to rely on Mace's unsupported opinion that Enns drove on the shoulder for no reason and thus violated the Transportation Code. A peace officer's conclusory opinion that a person's conduct was criminal or violated the law is not a valid basis for reasonable suspicion. *Ford*, 158 S.W.3d at 493.

The majority tries to justify its traffic-violation holding by asserting that "Mace could have suspected that driving on the shoulder was not done for a permissible purpose, but rather was an indicator that appellant was engaged in illegal drug activities." This assertion is notable in two ways. First, it has no basis in the record. Mace did not testify that he believed there was a connection between driving on the highway's shoulder and the transportation of illegal drugs either in general or in this particular instance. Second, the State did not make this argument in its brief. The majority has spun this theory out of whole cloth.

In support of its theory, the majority relies on two nonprecedential decisions: *Jolivette v. State*, No. 01-13-00451-CR, 2014 WL 3002081 (Tex. App.—Houston [1st Dist.] July 1, 2014, pet. ref'd) (mem. op., not designated for publication); and *Escamilla v. State*, No. 01-06-00299-CR, 2007 WL 1440228 (Tex. App.—Houston [1st Dist.] May 17, 2007, pet. ref'd) (mem. op., not designated for publication). Neither involved an operator who drove on an improved shoulder. Nor do they support the majority's assertion that doing so could lead an officer to reasonably suspect the operator is transporting illegal drugs.

In *Jolivette*, officers "decided to drive by a vacant lot known for narcotics and prostitution activity" a little before 3:00 in the morning. 2014 WL 3002081, at *1. As they approached, "they saw Jolivette's vehicle parked in the middle of the street with the headlights off." *Id.* A man "was standing next to the car talking to Jolivette through the driver's window." *Id.* When one of the officers turned on the patrol car's spotlight, the man who was talking to Jolivette immediately walked away and Jolivette made movements toward the floorboard that suggested he was trying to hide something. *Id.* After the same officer asked Jolivette to exit the vehicle, he saw drugs and drug paraphernalia in plain view. *Id.*

In the trial court, Jolivette moved to suppress the evidence. *Id.* The trial court denied his suppression motion, and we affirmed. *Id.* In affirming, we relied on several circumstances, including the officers' testimony that:

- the area was known for narcotics-related activity,

- it was uncommon for residents to be socializing so late at night,

- the men's behavior was consistent with narcotics-related activity, and

- the men's reaction to being observed was nervous or suspicious.

*Id.* at *6.

We also held that "the officers could have reasonably concluded Jolivette was violating traffic laws by being parked in the middle of the street, failing to use his headlights, and obstructing the roadway." *Id.* at *7. Notably, we did not explicitly

14

hold that these apparent traffic offenses lent further support to a reasonable belief that Jolivette was engaged in narcotics-related activities; instead, we merely stated that these traffic violations also supported the officers' "reasonable suspicion to conduct an investigative detention." *Id.* At any rate, even if we had explicitly held that Jolivette's traffic offenses supported the officers' reasonable suspicion that he was engaged in narcotics-related activity, his traffic offenses were part and parcel of what appeared to be a drug transaction taking place before the officers' very eyes— *i.e.*, Jolivette was parked in the middle of the street with his headlights off conversing with an apparent drug dealer through his vehicle's window. In contrast, driving on an improved shoulder does not bear any obvious relation to drug-related activity.

In *Escamilla*, officers received an anonymous tip that Escamilla dealt drugs out of his car. 2007 WL 1440228, at *1. They placed him under surveillance and followed him as he drove his car around the neighborhood, periodically stopping and engaging in what appeared to be drug sales to pedestrians. *Id.* Escamilla apparently became aware of the surveillance because he pulled up behind two unmarked police vehicles, flashed his high-beam headlights, and then sped away through the neighborhood at a speed in excess of 50 or 60 miles per hour, well above the speed limit. *Id.* After a brief pursuit, Escamilla pulled over and officers searched his car, in which they found a significant amount of drugs and cash. *Id.* at *1–2.

In the trial court, Escamilla moved to suppress the evidence, but the trial court denied his motion. *Id.* On appeal, he argued in part that the trial court should have granted his suppression motion because the officers who stopped him were operating outside their jurisdiction and thus lacked the statutory authority to stop him for speeding. *Id.* at *3 (Pasadena officers stopped Escamilla in Houston). In affirming the trial court's denial of the suppression motion, we held that the officers reasonably suspected Escamilla was engaged in illegal narcotics-related activities. *Id.* at *3. We reasoned that even though an officer testified that he stopped Escamilla for speeding, the testimony as a whole showed that Escamilla's traffic violation was merely one of multiple circumstances that led the officer to reasonably suspect that Escamilla was engaged in narcotics-related activities, including that:

- an anonymous source reported that Escamilla was selling narcotics,

- Escamilla's surveilled behavior was consistent with the sale of narcotics,

- Escamilla indicated that he became aware of the surveillance, and

- afterward, Escamilla fled from the surveilling officers.

*Id.* at *3–4.

*Escamilla* is nothing like the present case. The traffic offense in *Escamilla*, speeding, was undisputed and unambiguous. Moreover, as in *Jolivette*, the traffic offense bore a rational and obvious relationship to the suspected narcotics-related activity—once Escamilla noticed the officers' presence, he fled from them at a speed

16

well in excess of the limit. Headlong flight from officers always supports a finding of reasonable suspicion. *See Illinois v. Wardlaw*, 528 U.S. 119, 122–24 (2000) (holding unprovoked flight from area of narcotics trafficking after noticing officers provided reasonable suspicion to detain and observing that headlong flight is quintessential act of evasion suggestive of wrongdoing); *see also Matthews v. State*, 431 S.W.3d 596, 606 (Tex. Crim. App. 2014) (flight from officers increased their suspicion of illegal activity and constituted separate offense in its own right, specifically evading arrest or detention). Safely driving on an improved shoulder to allow another an opportunity to pass, in contrast, is neither like flight nor suggestive of wrongdoing. On the contrary, doing so is unequivocally lawful.

In sum, this case differs from *Jolivette* and *Escamilla* in at least two key ways. First, Mace could not have reasonably suspected that Enns committed a traffic offense by driving on the highway's improved shoulder because doing so under the circumstances was lawful. *See* TRANSP. § 545.058(a)(5); *Lothrop*, 372 S.W.3d at 191. To the extent that Mace thought otherwise, he was mistaken about the legal significance of the facts, and a mistake of this sort cannot support a finding of reasonable suspicion. *See Abney*, 394 S.W.3d at 550. Second, even if Mace could have reasonably suspected that Enns committed a traffic offense by driving on the highway's improved shoulder, this purported offense is not one of several circumstances that together could have led Mace to suspect Enns was transporting

narcotics. Driving on an improved shoulder does not bear any inherent relationship to the transportation of illegal drugs. Nor did Enns's driving on the shoulder make it more likely that he was transporting drugs when considered together with the other circumstances known to officers through the surveillance conducted in this case.

The majority disregards the law in holding that Mace reasonably suspected Enns may have committed a traffic offense. The majority's error does not affect the outcome of this case; drug surveillance gave peace officers reasonable suspicion to stop Enns regardless of any purported traffic offense. Left uncorrected, however, the majority's error endangers the constitutional right of motorists to travel Texas's highways free from objectively unreasonable traffic stops. I refuse to join the majority's decision to the extent it condones traffic stops based on conduct that the legislature has explicitly declared lawful.

## CONCLUSION

The majority reaches the correct result, but plainly errs in its analysis of whether peace officers reasonably suspected Enns committed a traffic offense. I therefore decline to join the majority's analysis of this issue. I agree with the remainder of the majority's opinion and concur in the judgment to affirm.


Gordon Goodman
Justice

18

Panel consists of Chief Justice Radack and Justices Goodman and Hightower.

Justice Goodman, concurring.

Publish. TEX. R. APP. P. 47.2(b).